41 A.3d 1013 (2012)
304 Conn. 679
Luis PATINO
v.
BIRKEN MANUFACTURING COMPANY.
No. 18441.
Supreme Court of Connecticut.
Argued January 31, 2012.
Decided May 15, 2012.
*1017 Peter D. Vodola, with whom were Elizabeth F. Ahlstrand and, on the brief, Mark B. Seiger, West Hartford, for the appellant (defendant).
Jon L. Schoenhorn, Hartford, with whom, on the brief, was Sara J. Packman, for the appellee (plaintiff).
Thomas W. Ude, Jr., filed a brief for the Lambda Legal Defense and Education Fund, Inc., et al., as amici curiae.
Nina T. Pirrotti and Bennett H. Klein, pro hac vice, filed a brief for the Connecticut Employment Lawyers Association et al. as amici curiae.
Charles Krich, principal attorney, and Derek Borchardt, law student intern, filed a brief for the commission on human rights and opportunities as amicus curiae.
ROGERS, C.J., and NORCOTT, ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js.[*]
ROGERS, C.J.
The central issue presented by this appeal[1] is whether General Statutes *1018 § 46a-81c (1)[2] imposes liability on employers for failing to take reasonable steps to prevent their employees from being subjected to hostile work environments based on their sexual orientation. The plaintiff, Luis Patino, commenced this action against the defendant, his former employer, Birken Manufacturing Company, claiming that it engaged in a discriminatory employment practice when it permitted his coworkers to harass him based on his sexual orientation over a period of many years.[3] Following a jury trial, the jury returned a verdict in favor of the plaintiff. The defendant then filed a motion to set aside the verdict and a motion for remittitur, both of which the trial court denied. The trial court thereafter rendered judgment in accordance with the verdict, from which the defendant appeals, claiming that: (1) § 46a-81c (1) does not provide for hostile work environment claims; (2) even if we were to assume that such claims can be brought under § 46a-81c (1), the plaintiff presented insufficient evidence to support the jury's finding of a hostile work environment; and (3) the award of damages was unsupported by the evidence and excessive. For the reasons that follow, we reject each of the defendant's claims. Accordingly, we affirm the judgment of the trial court.
The jury reasonably could have found the following facts. The plaintiff was employed by the defendant as a machinist from 1977 until his termination on November 8, 2004.[4] Beginning in 1991, the plaintiff became the subject of name-calling on the shop floor of the defendant's industrial plant. The name-calling consisted of derogatory slurs for homosexuals in Spanish, such as "pato" and "maricon," and in Italian and English, such as "pira," "faggot," and "homo." The slurs were used in a variety of contexts, including "faggot go home" and "faggot get out of here." The plaintiff heard such words "very often," *1019 sometimes even "two or three times a day." The derogatory words were not spoken to the plaintiff's face, but were made in his presence, such as directly behind his back while he was operating machinery. The plaintiff was devastated and "overwhelmed by anger and by frustration and the humiliation" resulting from the harassment. He testified that the demeaning treatment made him so upset that his body would shake, his work product suffered, and it became difficult for him to sleep.
Initially, in an effort to avoid confrontation, the plaintiff simply recorded the incidents in a series of diaries[5] and did not complain to the defendant about the harassment. After a period of five to six years, however, the plaintiff eventually complained to his supervisor, George Kemzura, who responded by holding a meeting with the plaintiff, the employees engaging in the harassment, and the company's owner. At the meeting, the owner indicated that "`bad words'" were being said, and that they were "`going to stop.'" After a few weeks of relief, the harassment recommenced, and the plaintiff again complained to Kemzura, who then transferred one of the offenders to a different facility. The transfer did not solve the problem, however, and soon other coworkers had "`join[ed] in the brouhaha,'" and began yelling more slurs in the plaintiff's presence.
In 1995, the plaintiff retained an attorney, who sent a letter to the defendant complaining about the harassment. Gary Greenberg, the defendant's then vice president and general counsel, responded in a letter dated April 20, 1995. In that letter, Greenberg recommended that the plaintiff be evaluated by a psychologist because the plaintiff's job required him to work with precision instruments and he thus posed a safety risk to others when his mental facilities were compromised. Meanwhile, the plaintiff continued to be subjected to harassment and to record the incidents in his diaries.
The plaintiff filed a total of five complaints with the commission on human rights and opportunities (commission), the first of which was filed on September 30, 1996. Following a hearing with the commission, the plaintiff wrote a second letter to the defendant describing the harassment he had experienced up to that point. On September 9, 1997, Greenberg again responded with a letter stating that the defendant had completed an investigation of the plaintiff's complaints and found that none of the plaintiff's coworkers knew anything about the alleged occurrences. On September 16, 1997,[6] the plaintiff sent the defendant another letter stating that he would not continue sending letters to the defendant describing the incidents because doing so would be "`an exercise in futility.'"
The parties thereafter settled the plaintiff's first complaint with the commission by agreeing that the defendant would hold a workplace harassment seminar in November, 1997. At the seminar, employees were informed that they could lose their jobs, be suspended, or even be sued by the defendant if they made derogatory remarks. Few of the employees engaging in the harassment attended the seminar, however, and the harassment did not cease.
The plaintiff filed his second complaint with the commission in 1998, but summarily withdrew it in an attempt to "improv[e] *1020 the atmosphere of the shop." The plaintiff then wrote three more letters to the defendant describing yet more harassment and the detrimental effect that the harassment was having on the plaintiff's work product.[7] On October 7, 1999, after being informed that the defendant had discussed the matter with the plaintiff's coworkers but had ultimately ended the investigation, the plaintiff filed a third complaint with the commission. The plaintiff then filed a fourth complaint with the commission on March 8, 2002, in which he described fifteen more incidents of harassment. Six months later, still having obtained no relief, the plaintiff wrote another letter to the defendant, dated August 25, 2003.[8]
In January, 2004, five months after sending his last letter to the defendant, the plaintiff filed a fifth complaint with the commission, which is the subject of the present action.[9] The complaint alleged that the defendant had violated § 46a-81c (1) "by creating a hostile work environment because of the plaintiff's sexual orientation, [and] failing to take adequate measures to alleviate the harassment or to remedy the hostile work environment...." The defendant responded by filing a general denial of the plaintiff's allegations.
Following a jury trial, the jury found in favor of the plaintiff and awarded him $94,500 in noneconomic damages. The defendant filed two postjudgment motions: a motion to set aside the verdict and a motion for remittitur. The trial court denied the motions, concluding that: (1) although § 46a-81c (1) contains no provision explicitly creating hostile work environment claims, "the statute prohibits discrimination `in terms, conditions or privileges of employment,' which ... is an `expansive concept' that authorizes [such claims]"; (2) the plaintiff presented sufficient evidence to support the finding that a hostile work environment existed and the award of damages; and (3) the damages award was not excessive and fell "within the necessarily uncertain limits of fair and just damages ... and [was] proportional to compensatory damages awarded in [similar] cases." (Citation omitted; internal quotation marks omitted.) This appeal followed.[10]

I
The defendant first claims that the trial court improperly denied its motion to set aside the verdict by concluding that § 46a-81c (1) creates a cause of action for hostile work environment claims. The defendant essentially contends that, because the statute does not contain the words "hostile workplace" or "hostile environment," the text of the statute plainly and unambiguously indicates that there is no such cause of action. The plaintiff responds that the "terms and conditions" language of § 46a-81c (1) has acquired a peculiar and appropriate definition in the context of antidiscrimination law that "leaves little room for doubt concerning its meaning." In the alternative, the plaintiff *1021 and certain of the amici curiae[11] assert that, even if ambiguous, extratextual evidence demonstrates that the legislature intended to create a hostile work environment cause of action under § 46a-81c (1). We agree with the plaintiff, and conclude that, because the phrase "terms, conditions or privileges of employment" is a well settled term of art in antidiscrimination law, hostile work environment claims fall within the purview of § 46a-81c (1).
As a preliminary matter, we set forth the applicable standard of review. Although we generally review a trial court's denial of a motion to set aside a verdict for an abuse of discretion; Hall v. Bergman, 296 Conn. 169, 179, 994 A.2d 666 (2010); the question whether § 46a-81c (1) provides relief for hostile work environment claims is a question of statutory interpretation over which our review is plenary. See In re Joseph W., 301 Conn. 245, 256, 21 A.3d 723 (2011).
The principles governing statutory construction are well established. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... In seeking to determine that meaning ... [General Statutes] § 1-2z[12] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter...." (Internal quotation marks omitted.) Francis v. Fonfara, 303 Conn. 292, 297, 33 A.3d 185 (2012).
We begin by reviewing the text of § 46a-81c, which provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's sexual orientation...." In construing this statute, we must first determine whether the phrase "terms, conditions or privileges of employment" is plain and unambiguous and does not yield absurd or unworkable results.
Although § 46a-81c does not itself define the phrase, such silence does not necessarily equate to ambiguity. See Mayfield v. Goshen Volunteer Fire Co., Inc., 301 Conn. 739, 745, 22 A.3d 1251 (2011). "The test to determine ambiguity *1022 is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) Francis v. Fonfara, supra, 303 Conn. at 297, 33 A.3d 185. In the absence of express statutory guidance, we must inquire whether the phrase is a legal term of art that has "acquired a peculiar and appropriate meaning in the law" requiring it to "be construed and understood accordingly." General Statutes § 1-1(a). "[L]egal terms ... absent any legislative intent shown to the contrary, are to be presumed to be used in their legal sense.... Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense.... In ascertaining legislative intent [r]ather than using terms in their everyday sense, [t]he law uses familiar legal expressions in their familiar legal sense." (Internal quotation marks omitted.) State v. Dupigney, 295 Conn. 50, 59, 988 A.2d 851 (2010).
This court previously has determined that "Connecticut antidiscrimination statutes should be interpreted in accordance with federal antidiscrimination laws." Curry v. Allan S. Goodman, Inc., 286 Conn. 390, 407, 944 A.2d 925 (2008); see also Thames Talent, Ltd. v. Commission on Human Rights & Opportunities, 265 Conn. 127, 139, 827 A.2d 659 (2003). Thus, in defining the contours of an employer's duties under antidiscrimination laws such as § 46a-81c, we have looked for guidance to federal case law. See, e.g., Brittell v. Dept. of Correction, 247 Conn. 148, 164, 717 A.2d 1254 (1998) (concluding legislature intended to make General Statutes § 46a-60 [a][1], which prohibits discrimination on basis of "race, color, religious creed, age, sex, marital status, national origin, ancestry ... [and] disability," coextensive with Title VII of the Civil Rights Act of 1964).
Analogous federal law that long predates and contains nearly identical language to § 46a-81c (1),[13] makes it "an unlawful employment practice for an employer... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." (Emphasis added.) Title VII of the Civil Rights Act of 1964, § 703(a)(1), codified as 42 U.S.C. § 2000e-2 (a)(1) (Title VII).
In Meritor Savings Bank v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court examined the legislature's use of the phrase "terms, conditions, or privileges of employment" in Title VII, and declared that it evinced a congressional intent "to strike at the entire spectrum of disparate treatment of men and women in employment." (Internal quotation marks omitted.) The court concluded that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Id., at 66, 106 S.Ct. 2399; Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (reaffirming standard set forth in Vinson); Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir.2001) (employing standard); see also Rogers v. Equal Employment Opportunity Commission, 454 F.2d 234, 237-38 (5th Cir.1971) (practice of racially segregating patients in physician's office was discrimination in "`the terms, conditions, or privileges of employment'"), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).
Consistent with Vinson and its progeny, this court declared in Brittell v. Department of Correction, supra, 247 Conn. at 166-67, 717 A.2d 1254, that to *1023 support a hostile work environment claim, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment...." (Emphasis added; internal quotation marks omitted.) By definition, therefore, a hostile work environment is one that is so severe that it affects the terms and conditions of the workplace.
In examining the phrase hostile work environment, we also look to Connecticut case law analyzing § 46a-60 (a)(1),[14] this state's broader antidiscrimination statute, which employs the identical phrase "terms, conditions or privileges of employment" as § 46a-81c (1) and also predates that statute. Having concluded in previous cases that the legislature intended to create a cause of action for hostile work environment claims by prohibiting employers from discriminating "in terms, conditions or privileges of employment" under § 46a-60 (a)(1); see Rodrigue v. Triumph Actuation Systems-Connecticut, LLC, Superior Court, judicial district of Hartford, Docket No. CV-11-6020397S, 2012 WL 432594 (January 20, 2012) (disability discrimination based on hearing loss); Tosado v. State, Superior Court, judicial district of Fairfield, Docket No. CV-03-0402149S, 2007 WL 969392 (March 15, 2007) (race, national origin, and ancestry discrimination); Bramwell v. State, Superior Court, judicial district of New Britain, Docket No. CV-97-0481200S, 2002 WL 725491 (March 28, 2002) (race discrimination); Hartford v. Casati, Superior Court, judicial district of Hartford, Docket No. CV-00-0599086S, 2001 WL 1420512 (October 25, 2001) (race discrimination); we now conclude that its use of the same phrase in § 46a-81c (1) evinces a similar intent with respect to sexual orientation discrimination. Cf. Morales v. ATP Health & Beauty Care, Inc., United States District Court, Docket No. 3:06CV01430 (AWT) (D.Conn. August 18, 2008) 2008 WL 3845294 (plaintiff permitted to use evidence of harassment based on sexual orientation to support hostile work environment claim because, unlike Title VII, § 46a-81c prohibits sexual orientation discrimination); Hartford v. Casati, supra (employee's use of words "dyke" and "fag" contributed to racially and sexually derogatory hostile work environment under § 46a-60 [a][1]).
This conclusion is consistent with the well established principle that, absent evidence to the contrary, "where the legislature uses the same phrase it intends the same meaning." (Internal quotation marks omitted.) Schiano v. Bliss Exterminating Co., 260 Conn. 21, 41, 792 A.2d 835 (2002). Accordingly, as a term of art with a fixed legal meaning in both federal and Connecticut antidiscrimination law, the phrase "terms, conditions or privileges of employment" appears in § 46a-81c (1) for the specific legislative purpose of permitting hostile work environment claims under that statute.[15]
*1024 Nevertheless, despite the fact that § 46a-60 (a)(1) employs language identical to § 46a-81c (1), the defendant in the present case urges us not to draw from our interpretation of § 46a-60 (a)(1) because "the legislature's different approach [in § 46a-81c] was [intended] to set this statute apart from other statutes that had a corresponding federal statute rooted in federal constitutional protections." The defendant contends that, "whereas Title VII codified a remedy for discrimination `that amounts to a constitutional tort' under the United States [c]onstitution," § 46a-81c, by extending protection to a class of persons not protected under the federal constitution, did not codify such a remedy.
The defendant's contention disregards the fact that, although modeled after Title VII, § 46a-60 (a)(1) is itself undoubtedly more expansive than Title VII and thus, like § 46a-81c, was intended to extend broader protection than its federal counterpart. Title VII prohibits discrimination only on the basis of "race, color, religion, sex, or national origin"; see 42 U.S.C. § 2000e-2 (a)(1); while § 46a-60 (a)(1) broadly prohibits discrimination based on "race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability...." Hence, § 46a-60 (a)(1) protects additional classes of individuals who are not entitled to protection under Title VII, but whom the legislature has nevertheless deemed deserving of such protection under state law. Nothing in the language of the relevant statutes suggests that the legislature intended less extensive protections for victims of sexual orientation discrimination than for victims of other forms of discrimination.[16]
In further support of its argument that our interpretation of the identical phrase in § 46a-60 (a)(1) is inapplicable to § 46a-81c because it provides more extensive protection than § 46a-81c, the defendant asserted at oral argument that, in Kerrigan v. Commissioner of Public Health, 289 Conn. 135, 206, 957 A.2d 407 (2008), this court acknowledged that Connecticut statutes prohibiting sexual orientation discrimination provide more limited protection than any other antidiscrimination statutes. Specifically, the defendant referred to our statement in Kerrigan regarding General Statutes §§ 46a-81a through 46a-81r, wherein we observed that, "the bill that did become [the gay rights] law provides more limited protection than the proposals that had preceded it, all of which would have added sexual orientation to the existing nondiscrimination laws and would have treated the classification in the same manner as other protected classes." Id. In Kerrigan, however, we focused on the legislation in its entirety, rather than § 46a-81c (1) specifically, which is the subsection at issue in the present case. Although other provisions concerning sexual orientation discrimination are or were limited by express provision; see, e.g., General Statutes (Rev. to 2009) § 46a-81r (law shall not be construed "to mean that the state of Connecticut condones homosexuality");[17] General Statutes § 46a-81p (exception for religious institutions); General Statutes § 46a-81q *1025 (exception for ROTC programs); § 46a-81c, the employment discrimination section, contains no such limitation. We therefore disagree with the defendant that the phrase "terms, conditions or privileges of employment" in § 46a-81c (1) should be more narrowly construed than § 46a-60 (a)(1). For the foregoing reasons, we conclude that it is proper for us to look to § 46a-60 (a)(1) when interpreting § 46a-81c (1).
The defendant next directs our attention to § 46a-60 (a)(8)(C), which specifically employs the phrase "hostile or offensive working environment" in the context of sexual harassment claims. The defendant asserts that, "[b]ecause the Connecticut legislature chose to use the hostile work environment language in § 46a-60 [(a)(8) ]... and did not do so in the statutory language of § 46a-81c ... the trial court should not have read into the statute language that does not exist." In other words, the defendant essentially seeks to limit hostile work environment claims to those claims arising under statutes specifically employing the "hostile or offensive work environment" terminology. We disagree.
Section 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section ... (8) For an employer, by the employer or the employer's agent ... to harass any employee, person seeking employment or member on the basis of sex. `Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when ... (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment...." (Emphasis added.)
Although § 46a-60 (a)(8)(C) contains the words "hostile or offensive working environment," we disagree with the defendant that the legislature must include such language in order to evince an intent to permit hostile work environment claims. First, we disagree because, according to the defendant's theory, under § 46a-60 (a)(1), which also does not contain the "hostile or offensive work environment" terminology; see footnote 14 of this opinion; the legislature intended not to permit hostile work environment claims arising out of discrimination on the basis of other classifications such as race, religion, age, marital status and disability. To the contrary, however, as we previously have explained, hostile work environment claims may be brought under § 46a-60 (a)(1) pursuant to that provision's prohibition of discrimination in "terms, conditions or privileges of employment...." See Rodrigue v. Triumph Actuation Systems-Connecticut, LLC, supra, Superior Court, Docket No. CV-11-6020397S (disability discrimination); Tosado v. State, supra, Superior Court, Docket No. CV-03-0402149S (race, national origin, and ancestry discrimination); Bramwell v. State, supra, Superior Court, Docket No. CV-97-0481200S (race discrimination); Hartford v. Casati, supra, Superior Court, Docket No. CV-00-0599086S (race discrimination); see also Smith v. Cingular Wireless, 579 F.Supp.2d 231 (D.Conn.2008) (Title VII hostile work environment claim based on store manager's refusal to accommodate plaintiff's back injury).
Indeed, because § 46a-60 (a)(8)(C) is Connecticut's only antidiscrimination statute containing the "hostile or offensive working environment" terminology, the defendant essentially claims that the legislature intended plaintiffs to obtain redress only in the sexual harassment context, apparently giving license to rampant workplace bigotry and thwarting the very purpose of antidiscrimination laws. As one amicus curiae points out, under such a *1026 system, so long as an employer took reasonable steps to prevent sexual harassment, it "could ignore an African-American employee's coworkers who repeatedly paper over her worksite with pictures of the Ku Klux Klan and burning crosses," and turn a blind eye when "a Jewish employee's coworkers ... paper the walls of his worksite with Nazi swastikas." We cannot conclude that the legislature intended such an absurd result when it employed the phrase "terms, conditions and privileges of employment" in both §§ 46a-60 (a)(1) and 46a-81c (1).
Second, the timeline of events leading up to the enactment of § 46a-60 (a)(8) is consistent with the legislature's use of the "hostile or offensive working environment" terminology in that statute. Specifically, § 46a-60 (a)(8) was adopted in 1980, the same year that the federal Equal Employment Opportunity Commission announced its stance that sexual harassment violates Title VII.[18] Although it took six years for the United States Supreme Court to conclude, consistent with the Equal Employment Opportunity Commission's stance on the issue, that sexual harassment violates Title VII; see Meritor Savings Bank v. Vinson, supra, 477 U.S. at 66, 106 S.Ct. 2399; the Connecticut legislature enacted § 46a-60 (a)(8) immediately following that commission's declaration in order to clarify that, at least under Connecticut law, sexual harassment violates § 46a-60 (a). This principle was well established however by 1991, when the legislature enacted § 46a-81c. It is therefore reasonable to conclude that the legislature did not include the hostile or offensive work environment terminology in § 46a-81c because it was clearly encompassed in the phrase "terms, conditions or privileges of employment" by that time.
Accordingly, we conclude that the phrase "terms, conditions or privileges of employment" constitutes a term of art with a fixed legal meaning, and the legislature's use of that phrase in § 46a-81c (1) evidences its intent to permit hostile work environment claims where employees are subject to sexual orientation discrimination.

II
The defendant next claims that, even if § 46a-81c creates a cause of action for hostile work environment claims, the jury's determination that a hostile work environment existed in the present case is wholly unsupported by the evidence. Specifically, the defendant first asserts that the derogatory and homophobic slurs were never said directly to the plaintiff. Second, the defendant contends that the slurs were commonly made in languages not understood by the plaintiff, who is fluent only in Spanish and English, and that there is an alternative definition for at least one Spanish word that was used by the plaintiff's coworkers. Finally, the defendant asserts that the plaintiff voluntarily chose to work on paid vacation days, and "[i]t makes no sense that [the plaintiff] experienced what a reasonable person would describe as an objectively hostile work environment if, on a day when he was entitled to stay away from work and still get paid, he chose to show up at the shop." We reject each argument in turn.
The applicable standard of review is well settled. "The proper appellate standard of review when considering the *1027 action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard.... In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling.... Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done.... [T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror ... but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did.... In reviewing the action of the trial court in denying [or granting a motion] ... to set aside the verdict, our primary concern is to determine whether the court abused its discretion.... The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to [the] evidence. Moreover, the trial judge can gauge the tenor of the trial, as [this court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Citations omitted; internal quotation marks omitted.) Hall v. Bergman, supra, 296 Conn. at 179, 994 A.2d 666.
As we have stated previously, to establish a hostile work environment claim, a plaintiff must produce evidence sufficient to show that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.... [I]n order to be actionable ... a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." (Citations omitted; internal quotation marks omitted.) Brittell v. Dept. of Correction, supra, 247 Conn. at 166-67, 717 A.2d 1254; see also Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir.2010). Whether an environment is objectively hostile is determined by looking at the record as a whole and at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., supra, 510 U.S. at 23, 114 S.Ct. 367. As the Court of Appeals for the Second Circuit explained with respect to offensive slurs in another context: "[T]here must be more than a few isolated incidents of racial enmity... meaning that [i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.... Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs ... considered cumulatively in order to obtain a realistic view of the work environment...." (Citations omitted; internal quotation marks omitted.) Schwapp v. Avon, 118 F.3d 106, 110-11 (2d Cir.1997).
The evidence of a hostile work environment in the present case is that derogatory comments were made multiple times per week, sometimes several times a day, over a prolonged period of time, despite the plaintiff's repeated complaints to his supervisors. The plaintiff testified that his coworkers constantly yelled slurs in his presence as he worked on the shop floor. The plaintiff meticulously recorded each incident in his diaries, which were admitted into evidence for the jury to consider in reaching its verdict. On the basis of this evidence, we conclude that the trial *1028 court did not abuse its discretion when it concluded that the jury reasonably could have determined that the plaintiff was subjected to a hostile work environment.
Despite the plaintiff's testimony and diary entries, the defendant contends that the evidence was insufficient because the derogatory slurs were not "directed at" the plaintiff. In addressing this claim, we begin by noting that it is proper for us to consider conduct directed toward others in assessing the general work atmosphere; Gorzynski v. JetBlue Airways Corp., supra, 596 F.3d at 102-103; because discriminatory conduct need not be directed at a particular plaintiff in order to support a finding of a hostile work environment.[19] Even statements made to others not in an employee's presence are actionable when the employee is aware of the conduct taking place behind his back. See Schwapp v. Avon, supra, 118 F.3d at 111 ("[j]ust as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment ... the fact that a plaintiff learns second-hand of a racially derogatory comment or joke ... also can impact the work environment" [citation omitted]); Torres v. Pisano, 116 F.3d 625, 633 (2d Cir.1997) ("[a]n employee who knows that her boss is saying [sexually derogatory] things ... behind her back may reasonably find her working environment hostile"); Hartford v. Casati, supra, Superior Court, Docket No. CV-00-0599086S ("[t]hat discriminatory terms and comments are not used in the presence of or directed at particular individuals has provided no defense to employers under employment discrimination laws"). Thus, the fact that the derogatory comments complained of in the present case were not always directed specifically at the plaintiff, and appeared to be the product of a "locker-room office culture," does not shield the defendant from liability. See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 85 (2d Cir.2010) (Calabresi, J., concurring).
Regardless, we further conclude that the plaintiff presented sufficient evidence upon which the jury could reasonably have concluded *1029 that the derogatory remarks were in fact directed at the plaintiff. The plaintiff testified that his coworkers uttered derogatory slurs near him in particular, such as when "they were passing [his] aisle [on the shop floor]." Additionally, the plaintiff's diary entries explain that his coworkers regularly yelled homosexual slurs upon seeing the plaintiff while working on the shop floor and sometimes even made eye contact with him while doing so.[20]
The defendant also contends that the evidence was insufficient because the derogatory slurs were spoken in languages in which the plaintiff admittedly is not fluent. In support of this claim, the defendant points out that the plaintiff speaks fluent Spanish and English, but "testified that he was called[21] derogatory names in Spanish, French, Indian, Laotian, Portugese, and Vietnamese...." The defendant also asserts that one of the Spanish words used by the plaintiff's coworkers has a nonderogatory definition and that the plaintiff failed to prove that his coworkers intended its derogatory meaning when they used it. In particular, the defendant asserts that, in addition to being a homophobic slur, a "pato" is a male duck in Spanish. We emphatically disagree.
To begin, we note that the defendant failed to raise this argument before the trial court, either at trial or in its posttrial motions. Putting aside the issue of preservation, the defendant's notion that one must be fluent in a language in order to know that a particular word has a derogatory meaning defies common sense. Certainly, one may learn the meaning of a particular word without mastering an entire language. Furthermore, most of the slurs that the plaintiff heard while working on the defendant's shop floor were in English or Spanish, which the plaintiff does speak fluently. Finally, with respect to the defendant's argument that "pato" means a male duck in Spanish, other courts have noted that English words like "fag" and "faggot" similarly have several uses in the English language: "`Fag' can mean a tuft of grass, a cigarette, or toil. A faggot can be a bundle of sticks, or a spicy meatball." King v. Burris, 588 F.Supp. 1152, 1157 n. 10 (D.Colo. 1984). Nevertheless, those courts have explained that, when one definition of a term predominates, courts may follow the interpretation most reasonable in context. Id. "To suggest otherwise serves only to further tax the gullibility of the credulous and require this court to espouse a naivete' unwarranted under the circumstances." Moricoli v. Schwartz, 46 Ill.App.3d 481, 483, 5 Ill.Dec. 74, 361 N.E.2d 74 (1977). As there are presumably few occasions on which employees would discuss male ducks on the shop floor of an industrial plant such as the defendant's, the argument that the plaintiff's coworkers did not intend to use the word pato in a derogatory way lacks merit.
The defendant's final argument regarding its claim of insufficient evidence to support the jury's verdict is that the plaintiff must not have found the environment hostile, as evidenced by his having chosen to work rather than taking *1030 all of the paid vacation days available to him. We again note that the defendant failed to raise this argument at trial or in either of its posttrial motions. Even if we were to assume that the defendant had properly preserved its argument, however, we wholly reject this claim. Although discrimination in the workplace may sometimes "discourage employees from remaining on the job, or keep them from advancing in their careers"; Harris v. Forklift Systems, Inc., supra, 510 U.S. at 22, 114 S.Ct. 367; the defendant cites, and we have found, no authority for the proposition that employees must take every opportunity offered to them to avoid their workplace in order to assert a hostile work environment claim. The plaintiff's decision to work rather than take paid vacation days could be attributable to a whole host of reasons, none of which bear on the question of whether the defendant's industrial plant was a hostile work environment. Indeed, by creating a cause of action for hostile work environment claims, the legislature acknowledged that constructive discharge claims offer insufficient redress for employees who, for a variety of reasons, must continue to work in hostile environments in spite of the harassment that they endure there. See generally id., at 21, 114 S.Ct. 367 (claims under Title VII are not limited to "economic" or "tangible" discrimination); Rogers v. Equal Employment Opportunity Commission, supra, 454 F.2d at 238 (employment discrimination is not limited to "isolated and distinguishable events" of "hiring, firing, and promoting"). Because "the victim of [workplace] harassment should not be punished for the conduct of the harasser"; (internal quotation marks omitted) Brittell v. Dept. of Correction, supra, 247 Conn. at 177, 717 A.2d 1254; we strongly disagree with the defendant's suggestion that the plaintiff's claim is undercut by his strong work ethic or ability to withstand harassment on the job. Accordingly, in light of the plaintiff's testimony indicating the detrimental effect of the harassment, we conclude that the trial court did not abuse its discretion when it concluded that there was sufficient evidence to support the jury's verdict.

III
The defendant's final claim on appeal is that the trial court, in denying the motion to set aside the verdict and the motion for remittitur, abused its discretion by concluding that the $94,500 noneconomic damages award was supported by the evidence and was not excessive. Specifically, the defendant asserts that: (1) the plaintiff produced little, if any, evidence of emotional distress; (2) the $94,500 damages award is tantamount to punitive damages as it is excessive and shocks the court's sense of justice; and (3) the trial court improperly applied Connecticut law in reaching its decision on the motions. The plaintiff responds that his testimony provided sufficient evidence of his damages, the award is not excessive, and the trial court properly applied the law in denying the defendant's motions.[22] We agree with the plaintiff.
Our analysis of this claim is guided by certain governing principles, which are applicable when reviewing appeals regarding motions to set aside a *1031 verdict as well as motions for remittitur. Because an award of damages is a matter peculiarly within the province of the trier of facts, we have held consistently that "a court should exercise its authority to order a remittitur rarelyonly in the most exceptional of circumstances." Saleh v. Ribeiro Trucking, LLC, 303 Conn. 276, 280, 32 A.3d 318 (2011). "In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict.... Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant.... The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption.... The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Citation omitted; internal quotation marks omitted.) Id., at 281, 32 A.3d 318.
Furthermore, "[t]he decision whether to reduce a jury verdict because it is excessive as a matter of law ... rests solely within the discretion of the trial court.... [Consequently], the proper standard of review of a trial court's decision to grant or deny a motion to set aside a verdict as excessive as a matter of law is that of abuse of discretion.... Accordingly, the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Citations omitted; internal quotation marks omitted.) Id., at 281-82, 32 A.3d 318.
In the present case, giving every reasonable presumption in favor of the verdict's correctness, we conclude that the trial court did not abuse its discretion when it determined that the plaintiff presented sufficient evidence to support the damages award.[23] The jury reasonably could have credited the plaintiff's testimony that the harassment he experienced over the period of more than two years at issue devastated and overwhelmed him, making him angry, sad, and humiliated, and feeling diminished.[24] The plaintiff further testified that he had difficulty sleeping, and, in at least one of his letters to Greenberg, he stated that the stress was so overwhelming that his body would *1032 shake and his work product suffered as a result.[25] See Olsen v. Nassau, 615 F.Supp.2d 35, 46 (E.D.N.Y.2009) ("[i]n garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff" [internal quotation marks omitted]).
Furthermore, given the sustained nature of the discrimination described by the plaintiff, the severity of the hostility he experienced, and the continued failure of the defendant to remedy the situation, the trial court did not abuse its discretion when it concluded that the award was not excessive or shocking when compared to verdicts awarded under similar circumstances.[26] See, e.g., Gonzalez v. Bratton, 147 F.Supp.2d 180, 208-209 (S.D.N.Y.2001) ($250,000 compensatory damages award for emotional distress claim under both federal and state law); Oliver v. Cole Gift Centers, Inc., 85 F.Supp.2d 109, 114-15 (D.Conn.2000) ($100,000 compensatory damages award in Title VII and Connecticut Fair Employment Practices Act case); Ikram v. Waterbury Board of Education, United States District Court, Docket No. 3:95CV2478 (AHN), 1997 WL 597111, 1997 U.S. LEXIS 14619 (D.Conn. September 9, 1997) ($100,000 compensatory damages award in Title VII case); Annis v. Westchester, 939 F.Supp. 1115, 1121-22 (S.D.N.Y.1996) ($100,000 compensatory damages award based on 42 U.S.C. § 1983 civil rights violation causing plaintiff's emotional suffering); Rush v. Scott Specialty Gases, Inc., 930 F.Supp. 194, 199 (E.D.Pa.1996) ($100,000 compensatory damages award based on Title VII claim for plaintiff's emotional distress and depression); see also Olsen v. Nassau, supra, 615 F.Supp.2d at 46 ("[g]arden variety emotional distress claims generally merit $30,000 to $125,000 awards" [internal quotation marks omitted]).
Finally, we disagree with the defendant that the trial court misapplied Connecticut law regarding damages when it denied the posttrial motions. Specifically, the defendant argues that the trial court improperly stated that, in Delgado v. Cragganmore Associates Ltd. Partnership, United States District Court, Docket No. 3:01CV1633 (JCH), 2001 WL 1913745 (D.Conn. October 31, 2001), the District Court "held that a prejudgment remedy of approximately $77,000 [per plaintiff] reflecting potential emotional distress damages was not unreasonable for very serious discrimination cases." (Internal quotation marks omitted.) In actuality, the defendant *1033 asserts, the District Court in Delgado held that $77,000 was excessive and therefore reduced the award to $52,042 per plaintiff.
Contrary to the defendant's claim, we conclude that Delgado actually offers additional support for the damages award in the present case. As the trial court noted in its memorandum of decision denying the defendant's motions, the District Court in Delgado reviewed the amount of damages awarded in analogous discrimination cases and ultimately concluded that serious discrimination cases may in fact warrant damages awards of $77,000, and sometimes even $100,000 or more. In light of the jury's determination in the present case that the plaintiff was subjected to discrimination, which was reinforced by the plaintiff's testimony regarding the frequency and severity of the harassment, we reject the defendant's assertion that the District Court's decision in Delgado supports a reduction in the damages award here.
For the foregoing reasons, we conclude that the trial court did not abuse its discretion when it denied the defendant's posttrial motions.
The judgment of the trial court is affirmed.
In this opinion the other justices concurred.
NOTES
[*] This case was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Norcott, Zarella, McLachlan, Eveleigh and Harper. Although Chief Justice Rogers was not present when the case was argued before the court, she read the record and briefs and listened to oral argument prior to participating in this decision.
[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199(c) and Practice Book § 65-1.
[2] General Statutes § 46a-81c provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's sexual orientation or civil union status...."

We note that technical changes not relevant to this appeal were made to § 46a-81c subsequent to the incidents that occurred in this case. See Public Acts 2007, No. 07-245, § 3. For purposes of convenience, we refer to the current revision of the statute.
[3] The record reveals that the harassment began in the 1990s, and lasted until the plaintiff's termination in 2004. Without citing any authority, the defendant argues that this court may consider only the harassment that took place between June 26, 2002, and November 8, 2004, the time period subject to the plaintiff's fifth complaint filed with the commission. The United States Supreme Court has explained, however, that because hostile work environment claims, by their very nature, "cannot be said to occur on any particular day"; National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." Id., at 105, 122 S.Ct. 2061; see also McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir.2010). Because it is undisputed that some of the acts complained of in the present case fell within the statutory time period; see General Statutes (Rev. to 2005) § 46a-82 (e) (requiring complaint to be filed within 180 days after discriminatory acts); we conclude that it is appropriate for us to consider the entire scope of the hostile work environment.
[4] The plaintiff does not allege that he was terminated on the basis of his sexual orientation. Rather, in a separate proceeding before a federal agency, he claimed that he was fired for engaging in certain whistle-blowing activities.
[5] The plaintiff's first entry in his diary describing the harassment dates back to 1991, and his last entry is dated November 5, 2004.
[6] The trial court mistakenly indicated in its memorandum of decision that the plaintiff sent this letter in 2007. The record reflects that it was actually sent in 1997.
[7] Specifically, the plaintiff explained in one of the letters that he was so overwhelmed by the behavior of Ben Joseph, one his coworkers, and Kemzura, his supervisor, that he had lost his concentration at work, causing him to "[scrap] two parts from Pratt and Whitney."
[8] In this letter, the plaintiff described an incident in which a coworker yelled "fag" directly at the plaintiff in the presence of Kemzura, who did nothing to stop the harassment.
[9] The plaintiff obtained a release of jurisdiction from the commission on May 23, 2005.
[10] After the appeal was filed, the trial court awarded the plaintiff attorney's fees and the defendant amended its appeal. The defendant did not brief any issues relating to the award of attorney's fees and we do not consider that issue. See Czarnecki v. Plastics Liquidating Co., 179 Conn. 261, 262 n. 1, 425 A.2d 1289 (1979) ("claims of error not briefed are considered abandoned").
[11] Regarding the first issue on appeal, the following parties have submitted amicus curiae briefs in support of the plaintiff's position: Lambda Legal Defense and Education Fund, Inc.; the Connecticut Legal Rights Project; and the Connecticut Women's Education and Legal Fund, collectively; as well as the commission on human rights and opportunities, individually.
[12] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."
[13] Section 46a-81c was enacted in 1991. See Public Acts 1991, No. 91-58, § 3.
[14] General Statutes § 46a-60 (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section: (1) For an employer, by the employer or the employer's agent ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disability, mental retardation, learning disability or physical disability...." (Emphasis added.)
[15] Although the parties and amici curiae devoted portions of their briefs to the legislative history of § 46a-81c, our conclusion that the statute clearly and unambiguously provides for hostile work environment claims by employing a term of art prohibits us from analyzing these arguments even in support of our conclusion. See General Statutes § 1-2z.
[16] We note that in Kerrigan v. Commissioner of Public Health, 289 Conn. 135, 165-69, 957 A.2d 407 (2008), this court recognized that sexual orientation meets all of the requirements of a quasi-suspect classification under the Connecticut constitution and therefore sexual orientation is subject to the same heightened scrutiny as sex discrimination.
[17] Section 46a-81r was repealed, effective April 23, 2009.
[18] See Equal Employment Opportunity Commission Compliance Manual (CCH 2009) § 615, para. 3114(4), p. 3225. The Equal Employment Opportunity Commission derives its authority to issue guidelines on employment discrimination, including sexual harassment, from 42 U.S.C. § 2000e-16 (b).
[19] The defendant relies upon several federal District Court cases in support of its claim that derogatory comments must be directed at a plaintiff to be actionable, all of which we conclude are inapplicable in the present case. In Bronner v. Catholic Charities of the Roman Catholic Diocese of Syracuse, Inc., United States District Court, Docket No. 3:08-CV-0015, 2010 WL 981959, *13 (N.D.N.Y. March 15, 2010), for example, the District Court dismissed the plaintiff's hostile work environment claim, explaining that the claim "rest[ed] upon allegations of a few isolated and unspecified incidents of comments thought to be racist, criticism thought to be racially motivated, and unspecified jokes by co-workers, most of which were not directed at [the plaintiff] or identified with any precision." (Emphasis added.). Although the defendant places much significance upon the court's observation that the comments were "not directed at [the plaintiff]," the District Court in Bronner ultimately concluded that, "[c]ourt[s] can consider the conduct directed toward others in assessing the general work atmosphere...." (Emphasis added.) Id. The dismissal of the plaintiff's claim in Bronner was thus based upon other factors, including the lack of severity and infrequency of the comments, rather than the fact that they were not directed at the plaintiff.

Similarly, the defendant claims that Nurriddin v. Goldin, 382 F.Supp.2d 79, 108-109 (D.D.C.2005), cert. denied, 552 U.S. 1243, 128 S.Ct. 1473, 170 L.Ed.2d 296 (2008), established that statements directed at third parties are insufficient to demonstrate a hostile work environment. Although the District Court stated in Nurriddin that, "[w]hen racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established"; id., at 108; it reviewed multiple factors in rejecting the plaintiff's claims, including "the frequency, nature, severity and offensiveness of the alleged incidents...." Id., at 109. Accordingly, we conclude that the cases cited by the defendant do not support its broad claim that discriminatory remarks must always be directed at the plaintiff to be actionable.
[20] A diary entry dated September 3, 2004, for example, provides: "At 12:30 [a coworker] blasted the word `[f]ag' from the door of the men's room as I was in my machine ... I stared at him ... he was staring at me." Another entry dated November 4, 2004, provides: "At 1:45 [another coworker] screamed the word `[p]ato' as I came into his view through the alley between [two machines]...."
[21] We note that this statement by the defendant in its brief undercuts its prior argument that the evidence was insufficient to establish that the derogatory slurs were directed at the plaintiff.
[22] The following parties have submitted amicus curiae briefs in support of the plaintiff's position regarding the third issue on appeal: the Connecticut Employment Lawyers Association; African-American Affairs Commission; Center for Disability Rights; Connecticut Alliance for Business Opportunities; Connecticut Hispanic Bar Association; Connecticut Transadvocacy Coalition; Gay & Lesbian Advocates & Defenders; Permanent Commission on the Status of Women; and Triangle Community Center, collectively; as well as the commission on human rights and opportunities, individually.
[23] Although the brief filed by amici curiae Connecticut Employment Lawyers Association, African-American Affairs Commission, Center for Disability Rights, Connecticut Alliance for Business Opportunities, Connecticut Hispanic Bar Association, Connecticut Transadvocacy Coalition, Gay & Lesbian Advocates & Defenders, Permanent Commission on the Status of Women, and Triangle Community Center describes several studies examining in great detail the mental and physical harms associated with discrimination against minority groups, we may consider only the evidence contained in the record when reviewing the defendant's claim that the plaintiff presented insufficient evidence to support the award of damages in this case. Regarding the defendant's alternative claim, namely, that the motion for remittitur was improperly denied because the damages award was excessive, we need not address the question of whether we may properly consider the studies described by the amici curiae because we conclude that the evidence presented by the plaintiff, on its own, demonstrates that the damages award was appropriate.
[24] We note that the jury was instructed that the plaintiff's allegations pertained to the time period between June 26, 2002, and November 8, 2004. See footnote 3 of this opinion.
[25] The defendant asserts that the plaintiff failed to offer any medical or expert testimony to corroborate his "subjective testimony" about his emotional distress. The defendant essentially invites this court to conclude that a plaintiff's own testimony regarding the detrimental effect of derogatory and homophobic slurs is insufficient without corroboration. As the defendant itself acknowledged in its brief, however, Connecticut law requires no such evidence. Schanzer v. United Technologies Corp., 120 F.Supp.2d 200, 219 (D.Conn. 2000) (citing Berry v. Loiseau, 223 Conn. 786, 807, 614 A.2d 414 [(1992)]); see also Meacham v. Knolls Atomic Power Laboratory, 381 F.3d 56, 78 (2d Cir.2004) (recognizing that awards of more than $100,000 are often upheld even "without discussion of protracted suffering, truly egregious conduct, or medical treatment"). We reject the defendant's invitation to change the current law.
[26] In support of its claim, the defendant relies primarily upon Schanzer v. United Technologies Corp., 120 F.Supp.2d 200 (D.Conn.2000), and McInnis v. Weston, 458 F.Supp.2d 7 (D.Conn.2006). Although the District Court reduced the jury verdict in Schanzer, it specifically noted that the plaintiffs in that case had faced discrimination on only one occasion in the context of company-wide terminations, rather than on repeated occasions. Schanzer v. United Technologies Corp., supra, at 219. Furthermore, in McInnis, the District Court reduced the jury verdict from $960,000 to $150,000, which is still more than the damages award at issue in the present case. McInnis v. Weston, supra, at 19.