Commission on Human Rights & Opportunities *v.* Cantillon

## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES *v.* RICHARD CANTILLON ET AL.
(SC 20655)

Robinson, C. J., and McDonald, D'Auria, Mullins and Ecker, Js.

*Syllabus*

The complainant, H, filed a complaint with the plaintiff, the Commission on Human Rights and Opportunities, alleging housing discrimination on the basis of race against the defendant C, her neighbor in a condominium complex, who tormented H by repeatedly making obscene gestures, directing vile, racial epithets toward her, and threatening her. C was defaulted in the underlying administrative proceeding, and, following a hearing in damages, the human rights referee found that H had suffered emotional distress and awarded her $15,000 in damages. The commission, viewing the award as insufficient, appealed to the Superior Court, claiming that, under *Patino* v. *Birken Mfg. Co.* (304 Conn. 679), an award for garden-variety emotional distress damages presumptively must be at least $30,000, and that the referee made various errors of law in assessing the heinousness of C's conduct pursuant to the test that the commission adopted in its prior decision in *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco* (*Harrison*). The trial court, recognizing that it was bound by the highly deferential standard of review that governs administrative decisions, concluded that there was no legal basis for it to second-guess the award, and it rendered judgment dismissing the appeal. The Appellate Court affirmed the trial court's judgment, concluding that *Patino* did not adopt any presumptive floor for emotional distress damages and that the referee's heavily fact-specific assessment of H's emotional distress damages was not an abuse of discretion. On the granting of certification, the commission appealed to this court. *Held*:

1. There was no merit to the commission's claim that the referee's award of $15,000 in damages violated *Patino*, an employment discrimination case in which this court upheld a jury award of more than $90,000 in noneconomic damages for garden-variety emotional distress:

In *Patino*, the court cited to a series of cases in which awards of $100,000 or more had been made in civil rights cases and quoted a federal district court case in support of the proposition that garden-variety emotional distress claims "generally merit $30,000 to $125,000 awards," and the commission claimed, for purposes of the present case, that *Patino* therefore established that range for garden-variety emotional distress claims.

347 Conn. 58　　　　JUNE, 2023　　　　59

Commission on Human Rights & Opportunities *v.* Cantillon

This court clarified that its intent in *Patino* was to note that an award of damages that was squarely within the range of those awards that often are made in nearby jurisdictions will not shock the judicial conscience, and the court in *Patino* did not intend to use the range of damages referenced therein to establish the inverse rule, namely, that an award lower than the generally prevailing range of damages in federal jury trials is presumptively an abuse of discretion in Connecticut.

This court further clarified that the quote from the federal district court case on which *Patino* relied was misleading insofar as that federal case and its progeny acknowledged that the range of awards in the Second Circuit is much wider than $30,000 to $125,000, in both directions.

Moreover, confining emotional distress damages to some permissible range would run afoul of decades of Connecticut jurisprudence, insofar as this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages.

Furthermore, the commission did not identify any other area of the law in which Connecticut courts have taken the extraordinary step of establishing any limit on the amount of damages that presumptively can be awarded by a Connecticut jury, court, or administrative agency, and it would be inappropriate for courts to do so insofar as the determination of whether to establish some minimum or maximum permissible award for any particular cause of action, in light of evolving public sentiments and the conflicting societal interests involved, is a quintessentially legislative, rather than judicial, function, especially when that determination involves an administrative agency.

Notwithstanding the commission's claim to the contrary, the lack of a floor on emotional distress damages awards that is consistent with the lower end of the prevailing range of awards in the Second Circuit would not create a forum shopping issue, as there was no evidence that complainants have been engaging in such forum shopping, and, even if federal jury awards were in the range that *Patino* quoted, there are many other differences between pursuing an administrative complaint before the commission and litigating a civil action in federal court that might make one venue or the other more advantageous for a particular complainant.

2. The commission could not prevail on its claim that the referee incorrectly applied and expanded the three factor test that the commission adopted in *Harrison* for calculating emotional distress damages, and the Appellate Court correctly determined that the referee invoked the applicable legal standard, that her application of that standard did not represent an abuse of discretion, and that her factual findings were not clearly erroneous:

Commission on Human Rights & Opportunities *v.* Cantillon

*Harrison* recognized that the first and most important factor in calculating emotional distress damages is the subjective internal emotional reaction of the complainant to the discriminatory experience that he or she had undergone, and whether the reaction was intense, prolonged, and understandable, the second factor is whether the discrimination occurred in public, and the third factor is the degree of the offensiveness of the discrimination and the impact on the complainant.

The referee in the present case found that the first factor warranted some award of emotional distress damages, but she also found the existence of mitigating factors, such as the fact that H relied on her own testimony to support her emotional distress claim, which was largely but not completely uncorroborated, and such as the facts that H did not seek medical or psychological help, miss work, move from the condominium, or suffer an inability to eat or sleep.

The commission did not contest any of the referee's factual findings with respect to the first *Harrison* factor, which were entitled to substantial deference, but, instead, claimed that the referee did not adequately or appropriately weigh various objective factors, the commission could not prevail on that claim because the referee correctly recognized that the subjective factors were paramount and properly considered determinants that were directly relevant to assessing subjective emotional distress, and, on the basis of those considerations and the referee's own observations, the referee found that H's subjective emotional distress, although serious, was not so severe or disabling as to warrant an award in the range sought by the commission.

Moreover, to the extent that the commission's arguments constituted a critique of the *Harrison* three factor test, this court declined to reexamine it in light of the unique procedural posture of the case, in which opposing viewpoints had not been represented, and insofar as the parties did not ask this court to reject the *Harrison* test.

(*One justice dissenting*)

Argued December 21, 2022—officially released June 27, 2023

*Procedural History*

Appeal from the decision of a human rights referee for the defendant Commission on Human Rights and Opportunities, inter alia, declining to increase the amount of damages awarded to the defendant Kelly Howard in an action alleging housing discrimination against the named defendant, brought to the Superior Court in the judicial district of New Britain, where the court, *Cordani, J.*, rendered judgment dismissing the appeal, from

347 Conn. 58 JUNE, 2023 61

Commission on Human Rights & Opportunities *v.* Cantillon

which the plaintiff appealed to the Appellate Court, *Alvord*, *Alexander* and *Vertefeuille*, *Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*Michael E. Roberts*, human rights attorney, for the appellant (plaintiff).

*Anna-Marie Puryear*, human rights attorney, for the appellee (defendant Commission on Human Rights and Opportunities).

*William Tong*, attorney general, *Michael Skold*, deputy solicitor general, and *Colleen B. Valentine* and *Matthew F. Larock*, assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

*Opinion*

MULLINS, J. The facts of this case are deeply disturbing. For years, the named defendant, Richard Cantillon, tormented his neighbor, the complainant, Kelly Howard, repeatedly making obscene gestures and calling her the most vile racial epithets, including use of the N-word, when she attempted to access public areas of the condominium complex where they both resided.[1] Cantillon also physically menaced the complainant. He threatened to shoot her and punch her in the face, and he brandished a snow shovel on one occasion. These various incidents resulted in as many as thirty calls to the police. In response to this treatment, the complainant filed a neighbor versus neighbor claim with the Commission on Human Rights and Opportunities, alleg-

---

[1] By way of example, Cantillon called the complainant a "nigger" as many as five times per week, he told her that "[n]iggers don't belong here," and he warned her, "I'm . . . going to get you nigger." He also called her former boyfriend a "nigger," and he went so far as to call her daughter a "fat, Black nigger."

Commission on Human Rights & Opportunities *v.* Cantillon

ing housing discrimination, in that Cantillon had violated her civil rights on the basis of her race.[2]

Cantillon failed to appear for the administrative hearing on the complainant's claims. Consequently, he was defaulted. Then, after a hearing in damages, the presiding human rights referee found that the complainant had suffered emotional distress and awarded her $15,000 in damages, in addition to costs and postjudgment interest.

The commission itself, viewing the award as too low in light of the pervasive scope and nature of Cantillon's discriminatory conduct, appealed to the Superior Court, challenging the amount of the award. Specifically, the commission argued that (1) under *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 708, 41 A.3d 1013 (2012), an award for garden-variety emotional distress damages[3] presumptively must be at least $30,000, and (2) the referee made various errors of law in assessing the heinousness of Cantillon's conduct pursuant to the test espoused in *Commission on Human Rights & Oppor-*

---

[2] Specifically, the complainant alleged that Cantillon had engaged in discriminatory housing practices in violation of General Statutes § 46a-64c and the federal Fair Housing Act, 42 U.S.C. 3601 et seq., as applied via General Statutes § 46a-58 (a). In its amicus brief in opposition to certain arguments of the commission, the state raises the question of whether a housing discrimination claim is cognizable against a neighbor under either the federal or the state fair housing law. Because Cantillon is not present to argue that a claim may not be brought against a neighbor, in accordance with state and federal fair housing law, we assume, without deciding, that such a claim will lie under at least some circumstances.

[3] The term "garden-variety" is a bit of a misnomer, in that it seems to disparage these types of claims, when, in reality, it merely refers to mental suffering that is established primarily through the testimony of a plaintiff or a complainant and not through expert medical or psychological evidence. See, e.g., *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 707; see also, e.g., *Connecticut Judicial Branch* v. *Gilbert*, 343 Conn. 90, 127–28 n.25, 272 A.3d 603 (2022) (discussing definition of garden-variety emotional distress). That said, a claim of mental suffering that is supported only by the testimony of that individual may be more difficult for the trier of fact to assess than one that is corroborated by expert testimony.

Commission on Human Rights & Opportunities *v.* Cantillon

*tunities ex rel. Harrison* v. *Greco*, Docket No. 7930433 (C.H.R.O. June 3, 1985) (*Harrison*). Neither the complainant nor Cantillon participated in the appeal, however, and, for arcane reasons that are set forth in the decision of the Appellate Court; see *Commission on Human Rights & Opportunities* v. *Cantillon*, 207 Conn. App. 668, 670 n.1, 263 A.3d 887 (2021); the commission operated as both the appellant and the appellee in its appeal before the Superior Court. In doing so, the commission, as plaintiff, and the commission, as defendant, both challenged the referee's award as insufficient.[4]

Even though no party to the appeal defended the decision of the referee or argued in support of Cantillon's likely position that the award was not impermissibly low, the trial court, recognizing that it was bound by the highly deferential standard of review that governs administrative decisions; see General Statutes § 4-183 (j); concluded that there was no legal basis for it to second-guess the award and rendered judgment dismissing the appeal. For similar reasons, and with the parties similarly situated, the Appellate Court affirmed the judgment of the Superior Court. See *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 670–71, 686. This certified appeal followed.[5]

---

[4] General Statutes § 46a-94a (a) authorizes the commission (as plaintiff) to appeal to the Superior Court an adverse decision of a presiding officer, but the commission (as defendant) understands itself to be prevented from defending the decision of the officer because it owes a continuing obligation to the complainant. As a result, the defendant commission filed its brief arguing essentially the same position as the plaintiff commission. The complainant is also a defendant, although she has not participated in the appeal.

In the interest of simplicity, we refer to the plaintiff commission and the defendant commission collectively as the commission, except when it is necessary to identify one of those parties individually.

[5] We granted the plaintiff commission's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court had properly determined that the . . . referee adjudicating the underlying housing discrimination claim applied the proper legal principles in awarding the claimant 'garden-variety' damages for emotional distress in the amount of $15,000 against [Cantillon], a neighbor who repeat-

Commission on Human Rights & Opportunities *v.* Cantillon

Like the courts below, we are compelled to affirm. If some minimum award for garden-variety emotional distress damages is to be established for such heinous conduct, then that minimum amount must be established by the legislature, either independently, via legislation, or in conjunction with the commission, through the Uniform Administrative Procedure Act's rule-making process; see General Statutes § 4-168 et seq.; and not on an ad hoc basis by this court.

We presume the reader's familiarity with the well reasoned opinion of the Appellate Court. That court did an admirable job of setting forth the relevant facts and procedural history, describing the controlling standard of review, summarizing the commission's arguments as to the alleged flaws in the decision of the referee, and explaining why those arguments ultimately were not persuasive. Specifically, the Appellate Court did not read *Patino* to adopt any presumptive floor for emotional distress damages; see *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 673–79; and it concluded that the referee's heavily fact specific assessment of the complainant's emotional distress damages was not an abuse of discretion. See id., 679–86. We agree with that court's resolution of the commission's claims, and no useful purpose would be served by retracing those steps here. We take this opportunity, however, to clarify and elaborate on a few points raised by the commission.

I

The commission's primary argument is that the award violated the law of Connecticut, as purportedly set forth in *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 679. Specifically, the commission claims that our decision in

edly subjected the claimant to racially motivated verbal and physical harassment?" *Commission on Human Rights & Opportunities* v. *Cantillon*, 340 Conn. 909, 909–10, 264 A.3d 94 (2021).

Commission on Human Rights & Opportunities *v.* Cantillon

*Patino* set a range for garden-variety emotional distress claims of between $30,000 and $125,000. See id., 708. We disagree.

*Patino* involved an employment discrimination action in which the jury awarded the plaintiff $94,500 in non-economic damages for garden-variety emotional distress. See id., 682, 686. The defendant employer appealed from the trial court's denial of its posttrial motion for remittitur, contending that the $94,500 damages award was tantamount to punitive damages, as it was so excessive as to shock the conscience. Id., 705. In rejecting that claim, we emphasized that, "[b]ecause an award of damages is a matter peculiarly within the province of the trier of facts," a reviewing court should exercise its authority to order remittitur only when "the size of the verdict so shocks the sense of justice as to compel the conclusion that the [trier was] influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) Id., 705–706. That exacting standard was not satisfied in *Patino*, we concluded, because there was evidence that the plaintiff had suffered severe, prolonged discrimination and that the defendant had continually failed to remedy the situation. Id., 707–708. In response to the defendant's argument that a trial judge in a similar case had ordered a remittitur; see id., 708 n.26; we cited to a series of cases in which verdicts of $100,000 or more had been awarded in civil rights cases. Id., 708. Following that string citation, we wrote: "see also *Olsen* v. *Nassau*, [615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)] ('[garden-variety] emotional distress claims generally merit $30,000 to $125,000 awards' . . .)." *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 708.

The commission finds much meaning in this brief parenthetical. Specifically, the commission reads our citation to *Olsen* to mean that (1) when awarding damages, a referee must benchmark a case not only to other

Commission on Human Rights & Opportunities *v.* Cantillon

decisions of the commission, or even to jury verdicts in Connecticut state courts, but also to jury verdicts awarded in the federal courts of neighboring states, (2) a failure to do so would create inequities and inconsistencies and encourage forum shopping, and (3) our referencing of the $30,000 to $125,000 range was meant not just to be descriptive of typical jury verdicts but to establish a soft floor, that is, a norm or rule as to the minimum award that will be deemed presumptively valid.

After a thorough review of our decision in *Patino*, the Appellate Court concluded that "the holding pertaining to the damage[s] award was limited and based on the particular factual circumstances of that case"; *Commission on Human Rights & Opportunities* v. *Cantillon*, supra, 207 Conn. App. 676; and that, "[a]lthough perhaps instructive, these cursory references to a range of damages in other cases do not . . . [stand] for any binding principle pertaining to damage[s] awards in emotional distress actions." (Emphasis omitted.) Id., 677. We agree.

Our point in *Patino* was simply that an award of damages that was squarely within the range of those that often are awarded in this part of the country will not shock the judicial conscience. We were not called on, nor did we intend, to use a range of damages referenced in a string citation parenthetical to establish the inverse rule, namely, that an award *lower* than the generally prevailing range of damages awarded in federal jury trials is presumptively an abuse of discretion in Connecticut. And surely we did not intend to constrain an executive agency that was created and directed by the legislature to provide a prompt remedy.

Beyond the analysis offered by the Appellate Court, we would emphasize four additional points so as to resolve any confusion that *Patino* may have engendered. First, the quote from *Olsen*, that "[garden-vari-

Commission on Human Rights & Opportunities *v.* Cantillon

ety] emotional distress claims generally merit $30,000 to $125,000 awards,'' is misleading if not understood in context. (Internal quotation marks omitted.) *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46. Although the ''$30,000 to $125,000'' quote has received much attention, both *Olsen* and its progeny acknowledged that the range of awards in the Second Circuit is actually much wider. In fact, in *Olsen* itself, the court acknowledged that, in *Quinby* v. *WestLB AG*, Docket No. 04 Civ. 7406 (WHP), 2008 WL 3826695 (S.D.N.Y. August 15, 2008), the case from which *Olsen* borrowed the ''$30,000 to $125,000'' language; id., *3; the court authorized a $300,000 award for garden-variety emotional distress damages that, it concluded, was ''at or above the upper range of reasonableness . . . .'' (Citations omitted; internal quotation marks omitted.) *Olsen* v. *Nassau*, supra, 46, quoting *Quinby* v. *WestLB AG*, supra, *4.

Other cases decided in the Second Circuit over the past decade or so have remitted such damages to, or approved awards of, well below $30,000.[6] Indeed, just

---

[6] See, e.g., *Lore* v. *Syracuse*, 670 F.3d 127, 177 (''New York cases vary widely in the amount of damages awarded for mental anguish. Many do reduce awards to $30,000 or below.'' (Internal quotation marks omitted.)), modified, 460 Fed. Appx. 73 (2d Cir. 2012); *MacMillan* v. *Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 550–51, 561, 563 (S.D.N.Y. 2012) (holding, in employment discrimination case, that motion for new trial concerning compensatory damages would be granted unless plaintiff agreed to remittitur reducing amount of compensatory damages, observing that, ''[when] a plaintiff offers only sparse evidence of emotional distress . . . courts have reduced such awards to as little as $10,000,'' and concluding that ''an award of $30,000 constitutes the maximum that [can] be upheld . . . as not excessive'' (internal quotation marks omitted)); *Charvenko* v. *Barbera*, Docket No. 09-CV-6383T, 2011 WL 1672471, *6–8 (W.D.N.Y. March 30, 2011) (awarding $1000 in emotional distress damages in connection with default judgment in housing discrimination claim, and reviewing case law supporting comparably low awards when testimony of distress is largely conclusory or limited to describing feelings of humiliation) (report and recommendation adopted, Docket No. 09-CV-6383T, 2011 WL 1659882 (W.D.N.Y. May 3, 2011)); see also, e.g., *Borja-Fierro* v. *Girozentrale Vienna Bank*, Docket No. 91 Civ. 8743 (CMM), 1994 WL 240360, *4 (S.D.N.Y. May 27, 1994) (''in the vast majority of cases [involving similarly vague and conclusory testimony regarding mental anguish], courts found awards of $5,000 to $10,000 to be appro-

Commission on Human Rights & Opportunities *v.* Cantillon

last year, in *Fontana* v. *Bowls & Salads Mexican Grill, Inc.*, Docket No. 19-CV-01587 (JMA) (ARL), 2022 WL 2389298 (E.D.N.Y. July 1, 2022), the court approved an award of $15,000 in damages for garden-variety emotional distress in an employment discrimination case. Id., *1–2.

More recent assessments, therefore, have placed a much lower floor on the prevailing range of awards than did *Olsen*. See, e.g., *Fontana* v. *Bowls & Salads Mexican Grill, Inc.*, Docket No. 19-CV-01587 (JMA) (ARL), 2022 WL 3362181, *6 (E.D.N.Y. February 3, 2022) ("[f]or garden-variety emotional distress claims, courts in the Second Circuit have awarded damages ranging from $5,000 to $125,000") (report and recommendation adopted, Docket No. 19-CV-01587 (JMA) (ARL), 2022 WL 2389298 (E.D.N.Y. July 1, 2022)); *Manson* v. *Friedberg*, Docket No. 08 Civ. 3890 (RO), 2013 WL 2896971, *7 (S.D.N.Y. June 13, 2013) ("[f]or typical or [garden-variety] emotional distress claims, district courts have awarded damages ranging from $5,000 to $35,000" (internal quotation marks omitted)). *Olsen*'s range, then, is hardly a rule.[7]

Second, for this court to confine emotional distress damages to some permissible range by judicial fiat would run afoul of decades of Connecticut jurisprudence. Noneconomic damages, such as emotional distress, pain and suffering, are, "at best, rather indefinite and speculative in nature." *McKirdy* v. *Cascio*, 142 Conn. 80, 84, 111 A.2d 555 (1955). For more than fifty years, this court has rejected the idea that any specific

priate").

[7] It bears emphasizing that all of these federal cases were decided in the context of motions for remittitur, rather than for additur. "[T]he Supreme Court of the United States has declared, as a matter of federal law, that any additur violates the right to a jury trial that is guaranteed by the seventh amendment to the United States constitution." (Emphasis omitted.) *Turner* v. *Pascarelli*, 88 Conn. App. 720, 723, 871 A.2d 1044 (2005).

Commission on Human Rights & Opportunities *v.* Cantillon

yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages.

As we explained in *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 882 A.2d 653 (2005), in the closely related context of a motion for remittitur, "[t]he law . . . is well settled. The amount of a damage[s] award is a matter peculiarly within the province of the trier of fact . . . . The size of the verdict alone does not determine whether it is excessive. *The only practical test* to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the [trier of fact] was influenced by partiality, prejudice, mistake or corruption." (Emphasis added; internal quotation marks omitted.) Id., 783; see also, e.g., *Munn* v. *Hotchkiss School*, 326 Conn. 540, 577, 165 A.3d 1167 (2017) ("[Emotional distress damages and related] damages lie in an extremely uncertain area . . . in which it is quite impossible to assign values with any precision . . . . [N]o formulaic process of review applies . . . ." (Citation omitted; internal quotation marks omitted.)); *Wichers* v. *Hatch*, 252 Conn. 174, 181, 745 A.2d 789 (2000) (attempt by this court "to establish an arbitrary demarcation" for calculating noneconomic damages award would be "both unnecessary and unwise"); *Birgel* v. *Heintz*, 163 Conn. 23, 34, 301 A.2d 249 (1972) ("[p]roper compensation for personal injuries cannot be computed by mathematical formula, and the law furnishes no precise rule for [such an] assessment" (internal quotation marks omitted)).

Consistent with our repeated rejection of any "practical test" or "mathematical formula" for both additur and remittitur, this court long has been of the view that benchmarking a challenged award against awards in other cases is not required or even, necessarily, appro-

Commission on Human Rights & Opportunities *v.* Cantillon

priate, holding that "comparisons with amounts in other verdicts serve little purpose." *Gorham* v. *Farmington Motor Inn, Inc.*, 159 Conn. 576, 585, 271 A.2d 94 (1970), citing *Fairbanks* v. *State*, 143 Conn. 653, 661, 124 A.2d 893 (1956).

Most recently, in *Munn* v. *Hotchkiss School*, supra, 326 Conn. 540, in the context of a motion to remit a substantial award of more than \$30 million in noneconomic damages; see id., 543, 569; we declined the defendant's invitation "to examine the verdicts returned by other juries in other cases and to engage in an exercise of comparing which plaintiff's injuries are worse." Id., 578. We reiterated that "[n]o one life is like any other, and the damages for the destruction of one furnish no fixed standard for others. . . . Consequently, [*i*]*t serves no useful purpose to compare a verdict in one personal injury case with the verdicts in other personal injury cases*." (Citations omitted; emphasis added; internal quotation marks omitted.) Id.; see also, e.g., *Welsh* v. *Martinez*, 157 Conn. App. 223, 242, 114 A.3d 1231 ("[a]s our Supreme Court has explained, [c]omparison of verdicts is of little value" (internal quotation marks omitted)), cert. denied, 317 Conn. 922, 118 A.3d 63 (2015).[8]

The rationales that underlie these rules counsel perhaps most strongly against establishing a legal floor for garden-variety emotional distress damages. It is well established that everyday hurt feelings and affronts can, as a matter of fact or law, be insufficient as to be legally actionable; see, e.g., *Appleton* v. *Board of Education*, 254 Conn. 205, 211, 757 A.2d 1059 (2000); and that, even

---

[8] Although this has remained the prevailing view, as exemplified by our recent decision in *Munn* v. *Hotchkiss School*, supra, 326 Conn. 540, in a few older cases, this court suggested that cases from other jurisdictions, although not determinative, may offer some guidance in determining a fair and reasonable range of damages. See, e.g., *Wochek* v. *Foley*, 193 Conn. 582, 587, 477 A.2d 1015 (1984); *Gorczyca* v. *New York, New Haven & Hartford Railroad Co.*, 141 Conn. 701, 705, 109 A.2d 589 (1954).

347 Conn. 58 JUNE, 2023 71

Commission on Human Rights & Opportunities *v.* Cantillon

when a compensable injury has been proven, an award of no more than nominal emotional distress damages is permissible. See, e.g., *Richey* v. *Main Street Stafford, LLC*, 110 Conn. App. 209, 224–25, 954 A.2d 889 (2008). It would be an odd rule indeed if we were to hold, on the one hand, that it is permissible to award only a few dollars in the many cases in which the plaintiff's distress falls somewhere within the ordinary range of emotional harms endured in the course of any human life but then to hold, on the other hand, that, when more than nominal damages *are* awarded, the award must be $30,000 or more. Surely, across the broad spectrum of purely emotional human anguish, one can imagine an injury warranting a $15,000 award. Whether *this* was *that* injury, under the circumstances of this case, was a question for the referee. Notwithstanding our own view that this case certainly may have merited a more substantial award, pursuant to our standard of review, namely, to decide only whether, in light of the evidence, the referee has acted unreasonably, arbitrarily, illegally, or in abuse of her discretion; see, e.g., *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 318, 258 A.3d 1 (2021); we cannot conclude that the referee committed reversible error.

That brings us to the third point. The commission has not identified any other area of the law in which the courts of this state have taken the extraordinary step of establishing a limit—upward or downward— on the amount of damages that presumptively can be awarded by a Connecticut jury, court, or administrative agency. And for good reason. Public sentiments regarding the range of damages that is fair and fitting in different types of legal actions can vary widely and evolve rapidly. See, e.g., *Wochek* v. *Foley*, 193 Conn. 582, 586, 477 A.2d 1015 (1984) ("[t]he question of damages in personal injury cases, especially in these times of changing values, is always a difficult one" (internal quotation

Commission on Human Rights & Opportunities *v.* Cantillon

marks omitted)). For that reason, determining whether to establish some minimum or maximum permissible award for any particular cause of action, in light of evolving public sentiments and the conflicting societal interests involved, is a quintessentially legislative, rather than judicial, function, especially when that determination involves an executive agency. See, e.g., *Jarmie* v. *Troncale*, 306 Conn. 578, 624–25, 50 A.3d 802 (2012) (tort reform is proper domain of legislature); *Jones* v. *Karraker*, 98 Ill. 2d 487, 492, 457 N.E.2d 23 (1983) ("In our opinion placing a limit on the maximum or minimum amount of an award . . . is a legislative prerogative. We decline to do so."). In Connecticut, our legislature has exercised that prerogative on multiple occasions, establishing minimum[9] and maximum[10] damages of various sorts across a range of actions. It has not done so here.

Fourth, we are not persuaded by the commission's argument that, if we decline to set a floor for emotional distress damages awards consistent with the lower end of the prevailing range of awards in the Second Circuit, then there will be a forum shopping problem. The concern, it seems, is that complainants may choose to file an action in a federal district court, where they can be assured of a recovery of at least $30,000, rather than to file a claim with the commission.

Although forum shopping can be a problem in certain contexts; see, e.g., *Adams* v. *Aircraft Spruce & Spe-*

[9] See, e.g., General Statutes § 42-251 (b) (establishing minimum damages award of $250 for violation of rent-to-own agreement laws); General Statutes § 54-41r (establishing minimum compensatory damages award of $1000 for tampering with contents of private communications and for illegal wiretapping and electronic surveillance).

[10] See, e.g., General Statutes § 35-53 (b) (capping punitive damages in wilful and malicious misappropriation actions); General Statutes § 46a-89 (b) (2) (C) (same, discriminatory housing and public accommodations practices actions); General Statutes § 46a-98 (c) and (d) (same, discriminatory credit practice actions); General Statutes § 52-240b (same, product liability actions); and General Statutes § 52-564a (c) (capping civil damages that may be awarded to property owner in shoplifting action).

347 Conn. 58 JUNE, 2023 73

Commission on Human Rights & Opportunities *v.* Cantillon

*cialty Co.*, 345 Conn. 312, 348, 284 A.3d 600 (2022) (discussing concerns regarding forum shopping by non-resident plaintiffs); one must be careful not to overstate the concern. See, e.g., *New London County Mutual Ins. Co.* v. *Nantes*, 303 Conn. 737, 750–51, 36 A.3d 224 (2012). In the present case, the commission has presented no evidence that complainants have in fact been engaging in forum shopping of this sort, and there are many reasons why we believe that the concerns expressed by the commission are overstated. As we discussed, *Olsen* appears to have overstated the floor for garden-variety emotional distress damages in the Second Circuit. One need not look far to find recent federal cases in Connecticut in which emotional distress damages of less than \$30,000 were awarded.[11]

We note that, even if federal jury awards were in the range that *Olsen* indicated, there are many differences between pursuing an administrative complaint before the commission and litigating a civil action in federal court—everything from different statutes of limitations and institutional support for injured parties to alacrity and mandatory mediation—that might make one venue or the other more advantageous for a particular complainant. Accordingly, we do not see a serious forum shopping problem here.

II

The second principal argument raised by the commission is that the referee, in fashioning the damages award, incorrectly applied and expanded the so-called "*Harrison* factors." In *Harrison*, the commission adopted a three factor test to be applied when calculating

___

[11] See, e.g., *Champagne* v. *Columbia Dental, P.C.*, Docket No. 3:18-cv-01390 (VLB), 2022 WL 951687, *1 (D. Conn. March 30, 2022) (\$10,000 for sexual harassment and discrimination); *Brown* v. *B&D Land Clearing & Logging, LLC*, Docket No. 3:17-CV-01413 (KAD), 2020 WL 13248680, *4 (D. Conn. March 3, 2020) (\$10,000 for wrongful termination).

emotional distress damages. See *Commission on human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, Docket No. 7930433, pp. 7–8. "Under the *Harrison* analysis, the [first and] most important factor [in calculating emotional distress] damages is the subjective internal emotional reaction of the complainants to the discriminatory experience [that] they have undergone and whether the reaction was intense, prolonged and understandable. . . . [The second factor] . . . is whether the discrimination occurred in front of other people. . . . For this, the [referee] must consider [whether] the discriminatory act was [performed] in public and in view or earshot of other persons which would cause a more intense feeling of humiliation and embarrassment. . . . The third and final factor is the degree of the offensiveness of the discrimination and the impact on the complainant. . . . In other words, was the act egregious and was it done with the intention and effect of producing the maximum pain, embarrassment and humiliation." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, 213 Conn. App. 635, 653, 278 A.3d 607, cert. denied, 345 Conn. 962, 285 A.3d 389 (2022); see also *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, pp. 7–8. In the present case, the commission contends that the referee erred by, among other things, considering factors other than those highlighted in the test, such as the fact that Cantillon did not hold a position of power over the complainant, and misconstruing the second factor, namely, public humiliation.

We agree with the Appellate Court that the referee invoked the applicable legal standard, that her application of that standard did not represent an abuse of discretion, and that her factual findings were not clearly erroneous. See *Commission on Human Rights &*

Commission on Human Rights & Opportunities *v.* Cantillon

*Opportunities* v. *Cantillon,* supra, 207 Conn. App. 681–86.

*Harrison* recognizes that the subjective factors—the emotional and psychological impacts of the discriminatory conduct on the complainant—will always be the most important because what we ultimately are assessing is the degree of actual emotional distress suffered. The parties do not contend otherwise. The referee recognized this principle, observing, at the outset, that the complainant's "internal subjective emotional reaction to [Cantillon's] racially motivated harassment is the key element and the most important consideration."

Although the referee found that this element was satisfied, so as to warrant some award of emotional distress damages, she also repeatedly emphasized what she found to be various limiting or mitigating factors. First, the complainant relied on her own testimony to support her emotional distress claim, which was largely, though not completely, uncorroborated by relatives, friends, or associates. Second, the emotional distress was not enough to cause the complainant to seek medical or psychological help; nor did it cause her to miss any work or compel her to move from her condominium. Third, the distress did not rise to a level at which it interfered with her ability to sleep or eat. Indeed, there was no evidence of any recognized symptoms of severe emotional distress, such as "depression, mental anxiety, panic attacks, isolation, sleeplessness, weight loss, or increased [alcohol consumption] . . . ." From those facts, the referee determined that "there is no indication from the evidence presented that any emotional damage[s] suffered by the complainant [were] severe or had long-term implications or ramifications."

The commission does not contest any of those factual findings. Rather, the commission's primary challenge is that the referee did not adequately or appropriately

Commission on Human Rights & Opportunities *v.* Cantillon

weigh various objective factors. Specifically, the commission contends that the referee afforded insufficient weight to the unique heinousness of the N-word, the fact that Cantillon's abuse of the complainant did not occur entirely out of the public view,[12] and the secretive nature of Cantillon's conduct, but that the referee gave too much weight to the fact that Cantillon was merely a neighbor. But, as we stated, although these objective considerations are relevant to a referee's assessment of emotional damages, they are secondary to the subjective factors. The referee correctly recognized that the subjective factors are paramount, she considered determinants that are directly relevant to assessing subjective emotional distress, and, on the basis of those considerations and her own observations, she found, as a factual matter, that the complainant's subjective emotional distress, although serious, was not so severe or disabling as to warrant an award in the range sought by the commission.[13] Her factual findings in that regard are entitled to substantial deference. Although we might have assessed the complainant's condition differently, and although we certainly have some questions regarding the weight that the referee afforded to some of the secondary, objective factors, her conclusions were not arbitrary, illegal, or an abuse of discretion, which would be required to overturn them.[14]

---

[12] Consistent with the testimony, the referee found that, although Cantillon had directed racially disparaging slurs and obscene gestures at the complainant primarily when the two were alone and there were no witnesses to observe the harassment, witnesses did observe two such incidents, as well as Cantillon's threat, at a public meeting, to punch the complainant in the face. The commission argues that, rather than emphasizing the largely private nature of the harassment, the referee should have simply deemed the second *Harrison* factor satisfied on the basis of the handful of public incidents.

[13] The defendant commission concedes that "this is not a case [in which the complainant] felt embarrassed or humiliated . . . ."

[14] We have considered the plaintiff commission's other arguments, and, to the extent that the Appellate Court did not directly dispose of them, we conclude that they are without merit.

Commission on Human Rights & Opportunities *v.* Cantillon

We have one final observation. We understand that some of the commission's arguments could be construed as a critique of the *Harrison* test itself. The commission, for example, appears to take issue with the fact that the second *Harrison* factor assumes that public discrimination, which may be particularly embarrassing or humiliating, is necessarily more egregious than private, physically threatening discrimination, which may be more terrifying.

We are sympathetic to the commission's argument that, although the subjective factors will always be the most important, a host of more objective factors also may assist a referee in the difficult task of assessing another individual's internal psychological state, based on our shared understanding of what sorts of experiences tend to be the most traumatic and distressing. Those objective factors may include those emphasized by the commission—the heinous nature of the language involved, the insidious, secretive character of the discrimination, and the fact that the verbal abuse was paired with physical threats—as well as many other factors. For these and other reasons, we are not entirely convinced that the *Harrison* test represents a reasonable framework for assessing emotional distress damages.

The parties have not asked us to reject the *Harrison* three factor test, however. Given the unique procedural posture of this case, in which opposing viewpoints have not been represented, this is not the case in which to do so. Therefore, we save for another day the question of whether we should reexamine the *Harrison* framework.

We cannot overstate the vileness of Cantillon's language and his ongoing campaign to terrorize the complainant and, at times, her daughter and her former boyfriend, on the basis of their race. He should not be rewarded for the complainant's admirable resilience in

Commission on Human Rights & Opportunities *v.* Cantillon

the face of malice. We have little doubt that Cantillon's heinous conduct reasonably could have resulted in a damages award many times higher. But the referee, as the finder of fact, was in the best position to assess the necessarily uncertain nature and degree of the complainant's internal distress, and it would not be proper for us to substitute our own judgment for those factual determinations. See, e.g., *Meriden* v. *Freedom of Information Commission*, supra, 338 Conn. 318.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and McDONALD and D'AURIA, Js., concurred.

ECKER, J., dissenting. I agree with the majority that our decision in *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 708, 41 A.3d 1013 (2012), did not establish a presumptive benchmark range for damages awards in emotional distress cases before the Commission on Human Rights and Opportunities (CHRO). "For more than fifty years," the majority explains, "this court has rejected the idea that any specific yardstick can be applied to cabin the discretion of the trier of fact when calculating a fair and appropriate award of noneconomic damages." Part I of the majority opinion. My problem with the majority's holding is that, in the very next breath, it approves and endorses the use by the CHRO's human rights referee (referee) of a valuation method that employs just such a yardstick to constrain the award of noneconomic damages in the present case. Specifically, the referee used a handful of old CHRO awards to arrive at a definitive range of emotional distress damages with a "high water mark" of $50,000, and a low end of $6000. In arriving at this range, the referee refused to consider in her comparative valuation a vast reservoir of awards made by courts, juries, and other administrative agen-

347 Conn. 58 JUNE, 2023 79

Commission on Human Rights & Opportunities *v.* Cantillon

cies charged with the responsibility of valuing the emotional distress suffered by complainants, like the complainant in this case, Kelly Howard, who have endured illegal racial discrimination. The referee's chosen valuation methodology adopts a self-imposed, artificial, and arbitrary measure of damages for which I can find no judicial, legislative, or regulatory authority. Reversal is required so that a damages award can be calculated using a proper valuation methodology.

The referee's use of an unjustifiably restrictive valuation methodology is no accident. My research reveals that some or all of the current CHRO referees evidently have reached an informal consensus, with no official guidance, authorization, or approval, that the emotional distress damages awarded by courts, juries, and other administrative agencies in comparable cases are too high. Their chosen valuation methodology reflects an unofficial but deliberate policy choice to keep CHRO awards low. In implementing this policy, the referees have created a self-contained and self-replicating universe of comparative values that categorically excludes consideration of any awards other than those produced in-house at the CHRO. This practice should end, and this court should end it, because the referees have no authority to adopt a presumptive valuation range that, whether by design or in effect, produces emotional distress damages awards far lower than permitted by law.

I likewise find unjustifiable the referee's failure to account for inflation when relying on past CHRO awards, some decades old, to determine the value of the complainant's emotional distress. The referee awarded $15,000 to the complainant in the present case based on the referee's conclusion that the closest comparable awards were a CHRO award of $20,000 in 2000, an award of $25,000 in 2006, and—curiously—an award of no damages in 2008 resulting from a finding that there was no violation of Connecticut's discriminatory housing

Commission on Human Rights & Opportunities *v.* Cantillon

practice statute, General Statutes § 46a-64c.[1] See footnote 11 of this opinion. The referee also took into consideration awards to a husband and wife of $12,000 and $10,000 in 2008, and an award of $6000 in 2000. See id. The referee did not adjust any of these comparative values for inflation, despite the obvious and inarguable fact that the value of a dollar in 2000, 2006, and 2008 was significantly less than the value of a dollar in 2017, which is when the damages originally were awarded to the complainant in this case. For example, an award of $20,000 in 2000, adjusted for inflation, was worth approximately $29,000 in 2017.[2] The failure to account for inflation caused the referee to substantially undervalue the damages award in this case.

I

It is important to properly frame the precise nature of the errors committed by the referee in order to ascertain the correct standard of appellate review. To be clear, I do not quarrel with the referee's factual findings. Although I probably would have arrived at materially different findings than the referee did regarding the character and degree of the emotional distress suffered by the complainant, it is not the function of this court "to retry the case or to substitute its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Connecticut Judicial Branch* v. *Gilbert*, 343 Conn. 90, 135, 272 A.3d 603 (2022). Although the majority and I seem to agree that the size of the damages

---

[1] It was manifestly erroneous for the referee to value the complainant's emotional distress using a comparator case in which no liability for unlawful discrimination was found, and thus no compensable damages were awarded as a matter of law. See *Commission on Human Rights & Opportunities ex rel. McIntosh-Waller* v. *Vahistrom*, Docket No. 0750080, 2008 WL 2683291, *8–9 (C.H.R.O. June 6, 2008).

[2] Likewise, an award of $6000 in 2000 is the equivalent of approximately $8600 in 2017 dollars. See Bureau of Labor Statistics, United States Department of Labor, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 23, 2023).

347 Conn. 58 JUNE, 2023 81

Commission on Human Rights & Opportunities *v.* Cantillon

award reflects a distinctly parsimonious sensibility, we are required to defer to the referee's wide discretion in that regard. See, e.g., *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 81, 272 A.3d 639 (2022) ("[a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts" (internal quotation marks omitted)); cf. *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 783, 882 A.2d 653 (2005) ("[t]he amount of a damage[s] award is a matter peculiarly within the province of the trier of fact" (internal quotation marks omitted)).

The errors at issue, however, are not factual. Nor do they involve the nature or extent of the emotional distress suffered by the complainant as a result of the discriminatory conduct of the named defendant, Richard Cantillon. The errors are *methodological.* After the referee assessed the severity of the complainant's emotional distress using the framework set forth in *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, Docket No. 7930433 (C.H.R.O. June 3, 1985) (*Harrison*),[3] the referee then applied a particular methodology to value that emotional distress, i.e., to convert the harm into dollars. I will review that valuation methodology in more detail in parts II and III of this opinion, but the critical point for present purposes is that the referee arrived at a valuation on the basis of a range of awards for emotional distress damages

[3] *Harrison* instructs CHRO referees to consider the following factors when awarding emotional distress damages caused by discrimination: (1) the subjective internal emotional reaction of the complainant; (2) whether the discrimination occurred in front of other people; and (3) the degree of offensiveness of the discrimination and its impact on the complainant. See *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, Docket No. 7930433. Like the majority, I am not entirely convinced that the *Harrison* factors represent a proper framework for assessing emotional distress damages, especially in cases like the one before us. See part II of the majority opinion. The parties, however, have not challenged the legal validity of the *Harrison* factors, and, therefore, I do not address the issue.

Commission on Human Rights & Opportunities *v.* Cantillon

established by prior CHRO awards, to the exclusion of other relevant comparative data, and without taking into account the rate of inflation.[4]

The referee's selection of a valuation methodology presents a *legal* question on appeal because it raises the issue of whether a proper measure of damages has been employed to calculate the complainant's damages.[5] It is well established that, "[a]lthough the amount of recoverable damages is a question of fact, the measure of damages [on] which the factual computation is based is a question of law." (Internal quotation marks omitted.) *Oscar Gruss & Son, Inc.* v. *Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); see *Vermont Microsystems, Inc.*, v. *Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998) ("[a]lthough [the] calculation of the amount of damages is a factual determination, the formula used in making that calculation is a question of law"); *Carrillo* v. *Goldberg*, 141 Conn. App. 299, 307, 61 A.3d 1164 (2013) ("[w]e accord plenary

---

[4] On remand, the referee also applied *Patino* as a comparator, but only because she was ordered to do so by the trial court.

[5] This presents an issue of law because the valuation methodology itself was formulated on the basis of generally applicable principles regarding the range of damages recoverable for emotional distress caused by racial discrimination, without regard to the underlying facts of this particular case. See *Lysenko* v. *Sawaya*, 7 P.3d 783, 787 (Utah 2000) ("Questions of fact are generally regarded as entailing the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind. . . . Legal questions, in contrast, are defined as those [that] are not of fact but are essentially of rules or principles uniformly applied to persons of similar qualities and status in similar circumstances. . . . Thus, to determine whether the measure of damages . . . presented the trial court with a legal question . . . [the court] must determine whether there is a [rule] or [principle] governing the measure of damages that can be uniformly applied to persons of similar qualities and status in similar circumstances." (Citations omitted; internal quotation marks omitted.)). The *application* of that damages model to the particular facts of the case—e.g., whether the complainant's emotional distress fits within the selected range of damages—is a mixed question of law and fact that is entitled to deference. See General Statutes § 4-183 (j). This latter issue is not contested in the present case.

review to the [trial] court's legal basis for its damages award'' (internal quotation marks omitted)).[6]

The standard of review applied to legal determinations made by an administrative agency depends on a number of factors. "Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716, 6 A.3d 763 (2010).

The appropriate valuation methodology for emotional distress damages in discrimination cases has not previously been subjected to judicial scrutiny, and, therefore, I consider that narrow issue to present a pure question of law subject to plenary review.[7] See, e.g.,

___

[6] Damages assessed after the entry of default are no different. After default is entered, establishing the appropriate amount of damages involves two steps: (1) "determining the proper rule for calculating damages on . . . a claim," and (2) "assessing [the] plaintiff's evidence supporting [the] damages to be determined under this rule." (Internal quotation marks omitted.) *Pelgrift* v. *335 W. 41st Tavern, Inc.*, Docket No. 14-CV-8934 (AJN), 2018 WL 4735705, *3 (S.D.N.Y. September 30, 2018), appeal dismissed, United States Court of Appeals, Docket No. 18-3283 (2d Cir. February 12, 2019); see *Steiger* v. *J. S. Builders, Inc.*, 39 Conn. App. 32, 33, 35, 663 A.2d 432 (1995) ("the trial court applied the wrong standard in calculating the award of attorney's fees" after default judgment was entered against defendants).

[7] Even if the referee's valuation methodology were entitled to deference, I would conclude, for the reasons explained in parts II and III of this opinion, that the referee's exclusion of emotional distress damages awarded by courts, juries, and other administrative agencies to ascertain the value of the complainant's harm, as well as her failure to account for the passage

Commission on Human Rights & Opportunities *v.* Cantillon

*Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 526, 93 A.3d 1142 (2014) (for pure questions of law, plenary review is applicable unless agency's interpretation has been subjected to judicial scrutiny or is time-tested and reasonable); *Okeke* v. *Commissioner of Public Health*, 304 Conn. 317, 324, 39 A.3d 1095 (2012) (Under the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., "[a] reviewing court . . . is not required to defer to an improper application of the law. . . . It is the function of the courts to expound and apply governing principles of law." (Internal quotation marks omitted.)). Accordingly, we must resolve the legal question of whether the referee adopted the proper valuation methodology by limiting herself to a range of comparative cases that included only prior CHRO awards (and one jury award on remand) and excluded all other damages awarded for emotional distress caused by racial discrimination by courts, juries, and other administrative agencies, as well as the rate of inflation.

II

CHRO referees evidently have been employing a valuation methodology for discrimination claims that arrives at a dollar value for emotional distress solely on the basis of a relatively small number of prior CHRO cases in which such damages were awarded. Little to no consideration is given to the robust comparative data available from numerous other sources of valuation in the juridical realm that assigns dollar amounts to this specific form of harm, namely, damages awards made by courts, juries, and other administrative agencies. In my view, the referee erred by adopting a methodology that disregards all valuation data except awards made by the CHRO itself.

of time and rate of inflation, was arbitrary, capricious, and an abuse of discretion.

347 Conn. 58 JUNE, 2023 85

Commission on Human Rights & Opportunities *v.* Cantillon

It is well established that a referee charged with remedying a person's deprivation of civil rights protected by state and federal fair housing laws may award damages for emotional distress under General Statutes § 46a-86. See, e.g., *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 705, 855 A.2d 212 (2004) (emotional distress damages can be awarded under § 46a-86 (c)); *Commission on Human Rights & Opportunities ex rel. Cortes* v. *Valentin*, 213 Conn. App. 635, 651–52, 278 A.3d 607 (upholding emotional distress damages award under § 46a-64c), cert. denied, 345 Conn. 962, 285 A.3d 389 (2022). It is equally well established that the purpose of remedial awards under our antidiscrimination statutes is to make victims of discrimination "whole" and to deter "like discrimination in the future . . . ." (Internal quotation marks omitted.) *Connecticut Judicial Branch* v. *Gilbert*, supra, 343 Conn. 141; accord *Commission on Human Rights & Opportunities* v. *Board of Education*, supra, 694; see General Statutes § 46a-86 (c) ("upon a finding of a discriminatory practice prohibited by [among other provisions, General Statutes §§ 46a-58 and 46a-64c], the presiding officer *shall* determine the damage suffered by the complainant . . . as a result of such discriminatory practice" (emphasis added)); *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 478, 559 A.2d 1120 (1989) ("hearing officer[s] [have] not merely the power but the *duty* to render a decree which will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future" (emphasis added; internal quotation marks omitted)).

In recent years, it appears that CHRO referees have been relying almost exclusively on awards from their own agency when awarding damages for emotional distress, disregarding decisions that assess such damages from courts, juries, and other administrative agencies,

Commission on Human Rights & Opportunities *v.* Cantillon

such as the United States Department of Housing and Urban Development (HUD). See, e.g., *Commission on Human Rights & Opportunities ex rel. Lauray* v. *City Hall Café*, Docket No. 1530333, 2016 WL 1719121, *8 (C.H.R.O. March 31, 2016) (awarding $8000 for racial discrimination in violation of Connecticut Fair Employment Practices Act after reviewing only prior CHRO cases); *Commission on Human Rights & Opportunities ex rel. Jackson* v. *Pixbey*, Docket Nos. 0950094 and 0950095, 2010 WL 5517184, *7 (C.H.R.O. May 25, 2010) (awarding $40,000 in neighbor-on-neighbor, hostile housing environment case after reviewing only two CHRO cases); *Commission on Human Rights & Opportunities ex rel. Brown* v. *Jackson*, Docket Nos. 0750001 and 075002, 2008 WL 5122193, *24 (C.H.R.O. November 17, 2008) ("in recognition of the various awards order[ed] by [the CHRO]," awarding $12,000 to husband and $10,000 to wife as damages for hostile housing environment); *Commission on Human Rights & Opportunities ex rel. Scott* v. *Jemison*, Docket No. 9950020, 2000 WL 35575662, *1, *6, *9 (C.H.R.O. March 20, 2000) (awarding $6000 for emotional distress caused by housing discrimination after reviewing range of awards articulated in two prior CHRO decisions); *Commission on Human Rights & Opportunities ex rel. Little* v. *Clark*, Docket No. 9810387, 2000 WL 35575648, *13, *16 (C.H.R.O. August 2, 2000) (awarding $20,000 for emotional distress and noting that "[the requested] award of $75,000 [was] far out of line with the majority of awards ordered by [the CHRO]").

The referee in the present case followed this model. As the referee made clear in her memorandum of decision, she employed a valuation methodology limited solely to other CHRO comparators (and, on remand, one jury case), and deliberately excluded federal awards of damages for emotional distress. This unauthorized, arbitrary, and self-imposed limitation is not founded on

347 Conn. 58        JUNE, 2023        87

Commission on Human Rights & Opportunities *v.* Cantillon

law, logic, or principle, but on an unofficial, subjective assessment that the federal awards were too high. Indeed, to ensure that the valuation remained entirely uninfluenced by non-CHRO comparators, the referee declined to consider a few early CHRO cases that valued emotional harm on the basis of federal decisions, explaining that these awards were unreliable outliers because "[f]ederal awards for emotional distress in cases of housing discrimination have consistently been much higher than awards from [the CHRO]." (Internal quotation marks omitted.), quoting *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, Docket No. 0550116, 2006 WL 4753467, *8 n.6 (C.H.R.O. October 26, 2006) (critiquing *Commission on Human Rights & Opportunities ex rel. Planas* v. *Bierko*, Docket No. 9420599 (C.H.R.O. February 8, 1995), and its reliance on federal decisions, including awards from courts, juries, and other administrative agencies, such as HUD, in calculating award of $75,000). The referee, quoting *Commission on Human Rights & Opportunities ex rel. Lawton* v. *Jansen*, Docket No. 0550135, 2007 WL 4623071, *8 n.10 (C.H.R.O. October 18, 2007), noted that *Planas* is " 'at the far end of the extreme of awards' " due, in part, to its reliance on federal cases. The referee therefore took the $75,000 award in *Planas* out of the list of comparator cases and established, as a "high water mark," an award of $50,000 on the basis of *Commission on Human Rights & Opportunities ex rel. Maybin* v. *Berthiaume*, Docket No. 9950026 (C.H.R.O. March 29, 1999) (*Maybin*).[8]

_____

[8] Although the referee set the top of the range for emotional distress damages at $50,000 on the basis of the CHRO's prior damages award in *Maybin*, she also treated *Maybin* as an outlier, in part because "[t]he basis for the $50,000 emotional distress award rest[ed] primarily on the aggressive monetary award in *Planas*, on a trend in certain appellate decisions [that] have encouraged hearing officers to be aggressive in the award of [compensatory] damages . . . and on awards in other jurisdictions." (Citation omitted; internal quotation marks omitted.)

Commission on Human Rights & Opportunities *v.* Cantillon

Federal awards for emotional distress caused by housing discrimination were not the only comparators excluded from the referee's valuation methodology. The referee also categorically disregarded jury awards for emotional distress caused by racial discrimination. It was not until the trial court ordered the referee on remand to consider *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 679, that the referee reluctantly included *Patino* (and only *Patino*) in her valuation as the single non-CHRO damages award comparator.

The referee gave no legitimate reason to explain why she did not consider jury verdicts as part of her valuation of emotional distress damages. The referee stated that a comparison of values using jury verdicts is not possible because jury verdicts are unaccompanied by any explanation from the jury as to why it arrived at the amount of the award.[9] This assertion misses the point. The jury awards warranting consideration as comparators are those awards—and there are many of them—that are subject to judicial review, typically either for inadequacy or excessiveness. As in *Patino*, that review process results in a published judicial decision containing sufficient factual and contextual information to allow a judge—and a CHRO referee—to assess the evidence bearing on the jury's valuation and to use the data as a point of comparison, precisely as the referee in this case used the CHRO's own awards (and the *Patino* case) as comparators.[10] The referee's legal con-

---

[9] The referee also explained that "Connecticut courts have yet to issue an award of compensatory damages in a case involving a housing discrimination claim based on hostile environment harassment . . . ." (Footnote omitted.) This does not, however, explain the referee's failure to consider state jury awards for emotional distress in other contexts, such as employment discrimination.

[10] Indeed, when the trial court remanded the present case to the referee with instruction to reconsider the award of emotional distress damages in light of *Patino*, the referee had no difficulty comparing the underlying facts with those presented in *Patino* and concluding, as was her prerogative, that the harm was worse in *Patino* than it was in this case.

Commission on Human Rights & Opportunities *v.* Cantillon

clusion—that jury awards cannot be used as comparators because the jury does not explain its verdict—is erroneous.

The refusal to consider emotional distress damages awarded by courts, juries, and other administrative agencies as comparators led the referee in the present case to award the complainant $15,000, an award the referee fashioned on the basis of a data set consisting of nothing more than a few relatively dated CHRO decisions[11] establishing a presumptive range with a low end of $6000 and a high end of $50,000. The referee concluded that $15,000 was an appropriate award because it fell "well within the realm of compensatory awards

---

[11] The referee relied on the following comparators, from high to low, in creating this presumptive range: (1) *Commission on Human Rights & Opportunities ex rel. Maybin* v. *Berthiaume*, supra, Docket No. 9950026 ($50,000 emotional distress damages award in hostile housing environment case), (2) *Commission on Human Rights & Opportunities ex rel. Jackson* v. *Pixbey*, supra, 2010 WL 5517184, *8–9 ($40,000 emotional distress damages award in hostile housing environment case), (3) *Commission on Human Rights & Opportunities ex rel. Jackson* v. *Lutkowski*, Docket Nos. 0950094 and 0950095 (C.H.R.O. May 25, 2010) ($40,000 emotional distress damages award in hostile housing environment case), (4) *Commission on Human Rights & Opportunities ex rel. Lawton* v. *Jansen*, supra, 2007 WL 4623071, *1, *9 ($40,000 emotional distress damages award in hostile housing environment case), (5) *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, supra, 2006 WL 4753467, *10 ($25,000 emotional distress damages award in hostile housing environment case), (6) *Commission on Human Rights & Opportunities ex rel. Thomas* v. *Mills*, Docket No. 9510408 (C.H.R.O. August 5, 1998) ($25,000 emotional distress damages award in public accommodations case), (7) *Commission on Human Rights & Opportunities ex rel. Brown* v. *Jackson*, supra, 2008 WL 5122193, *24 ($22,000 emotional distress damages award in hostile housing environment case), (8) *Commission on Human Rights & Opportunities ex rel. Little* v. *Clark*, supra, 2000 WL 35575648, *1, *16 ($20,000 emotional distress damages award in hostile environment discrimination case), (9) *Commission on Human Rights & Opportunities ex rel. Scott* v. *Jemison*, supra, 2000 WL 35575662, *1 ($6000 emotional distress damages award in hostile housing environment case); (10) *Commission on Human Rights & Opportunities ex rel. McIntosh-Waller* v. *Vahistrom*, Docket No. 0750080, 2008 WL 2683291, *8–9 (C.H.R.O. June 6, 2008) (no damages were awarded because no liability was found in hostile housing environment case).

Commission on Human Rights & Opportunities *v.* Cantillon

ordered in similar cases decided by [the CHRO].'' By plotting the complainant's emotional harm within a range of values established by a handful of prior CHRO awards, the referee operated within an artificially and arbitrarily limited framework that required her award to fall within a presumptive range far narrower than that permitted by law. This constraint on the amount of damages awarded to the complainant is an error of law that necessitates reversal.

A number of inexplicable incongruities arise as a result of this court's decision today. First, the majority endorses the referee's use of an unauthorized, self-imposed constraint on the award of emotional distress damages by employing a presumptive range of damages with a low end of $6000 and a high end of $50,000, while rejecting the higher presumptive range taken from *Patino* because it constrains the referee's discretion.[12] Of even more concern, the range of damages used in the present case is derived solely from prior CHRO awards, whereas the range of damages described in *Patino* is based on federal jury verdicts. See *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 708. Jury verdicts are a more reliable indicator of the value to ascribe to emotional distress damages because each verdict is arrived at independently and, thus, provides a separate and distinct data point for comparison. By contrast, the range of awards for comparative purposes under the referee's methodology is strictly limited to a small number of awards previously made by the CHRO, and no one else. Moreover, a range established by prior CHRO decisions exists as a closed system—there is no fresh data to update or modify the referee's pool of compara-

---

[12] In my view, neither the jury awards nor the CHRO awards should create a presumptive range; the referee should consider as comparators administrative and judicial awards (including jury awards) for emotional distress caused by similar acts of illegal racial discrimination, and either accept or reject the comparison based on the similarity or dissimilarity or the underlying facts, not the identity of the decision maker.

Commission on Human Rights & Opportunities *v.* Cantillon

tive data because any "new" agency awards are themselves derived from prior valuations, and the system is therefore self-replicating. The valuation range derived from jury awards, by contrast, is subject to constant revision as the data set of comparators expands because these awards are made without consideration of other jury awards.[13]

Second, this is not a context in which the administrative agency can claim that deference is due because the agency possesses particular, technical expertise in the subject matter; there is no reason to think that CHRO referees are any better than juries or federal agencies at valuing emotional distress caused by racial discrimination. Given the inherent difficulty of assessing emotional distress damages, it seems obvious to me that the more valuation data utilized, the more accurate, just, and fair the assessment of damages will be. As the majority acknowledges, damages for intangible harms,

_____

[13] The majority relies on our case law regarding additur and remittitur to conclude that "benchmarking a challenged award against awards in other cases is not required or even, necessarily, appropriate" because "comparisons with amounts in other verdicts serve little purpose." (Internal quotation marks omitted.) Part I of the majority opinion. I agree with the majority that a comparison to other jury awards normally is unhelpful to determine whether a jury award in any particular case is inadequate or excessive, because "[j]uries may differ widely in the conclusions [that] they reach in what may be apparently similar cases, and, in fact, in any given case one jury may arrive at a result substantially different from that of another jury." (Internal quotation marks omitted.) *Munn* v. *Hotchkiss School*, 326 Conn. 540, 579, 165 A.3d 1167 (2017). As we previously have observed, "[t]his flexibility, though it may lead to uncertainty, is a necessary concomitant of the jury system as it operates in cases of this nature." *Birgel* v. *Heintz*, 163 Conn. 23, 34, 301 A.2d 249 (1972). Indeed, jurors are not allowed to learn about awards in other cases. But CHRO referees are not jurors; they are administrative decision makers who arrive at a fair and just valuation of emotional distress damages by reference to damages awards for emotional distress in other cases involving comparable facts. For comparative purposes, it is irrelevant whether the other awards are made by courts, juries, or other administrative agency adjudicators, so long as they represent a fair and fitting valuation of emotional distress damages under factually comparable circumstances.

Commission on Human Rights & Opportunities *v.* Cantillon

such as pain, suffering, and emotional distress, "lie in an extremely uncertain area . . . in which it is quite impossible to assign values with any precision . . . . [N]o formulaic process of review [for excessiveness or inadequacy] applies . . . ." (Internal quotation marks omitted.) Part I of the majority opinion; see *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 287, 25 A.3d 632 (2011) (recognizing that "[the] limits of fair and reasonable compensation in [a] particular case" are "necessarily uncertain" (internal quotation marks omitted)); see also *Stampf* v. *Long Island Railroad Co.*, 761 F.3d 192, 205 (2d Cir. 2014) ("Awards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress."). The availability of data about what other decision makers have done under comparable circumstances provides a very useful reference point for those charged with the responsibility of navigating this uncertain landscape. One would think that CHRO referees assigned with the responsibility of awarding money damages for emotional distress would see a great benefit in consulting all relevant data—including damages awarded by courts, juries, and other administrative agencies in comparable cases—before undertaking the humbling task of telling the victim of discrimination the value of his or her suffering in the eyes of the law.

Such guidance is particularly important when a decision maker is trying to fix a monetary value to the unique kind of emotional harm caused by racial discrimination. Many other forms of emotional distress are assessed on a strictly individual basis because the effects tend to be idiosyncratic to the individual victim. Group based racial discrimination is different. The wrongful act of discrimination itself, as well as the harm caused to the victim, inherently contains a shared, collective dimension, as one would expect of illegal conduct that achieves

Commission on Human Rights & Opportunities *v.* Cantillon

its goal through the weaponization of the deeply embedded history of racism in our country. The harm that each individual suffers will be different, of course, and must be assessed on an individual basis, but we cannot ignore the reality that racial discrimination has very powerful social and cultural dimensions that necessarily impact the nature and extent of the resulting psychic harm. There is substantial evidence, for example, that racial discrimination in America has such a deep, pervasive, and persistent place in our history that the harm it causes is especially profound.[14]

Given the unique nature of the harm caused by racial discrimination, and in light of the fact that the valuation of emotional distress is not a matter of science, there is particular benefit in consulting jury awards for comparative purposes. The jury system has its flaws, but there are certain contexts in which jurors have an especially important role in our system of justice as repre-

---

[14] The United States Supreme Court, lower federal courts, this court, and legal scholars all have remarked on the severe, pervasive, and often irreversible harm caused by racial discrimination. See, e.g., *Brown* v. *Board of Education*, 347 U.S. 483, 494, 74 S. Ct. 686, 98 L. Ed. 873 (1954) ("[t]o separate [children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone"); *Mardell* v. *Harleysville Life Ins. Co.*, 65 F.3d 1072, 1074 (3d Cir. 1995) ("[a] victim of discrimination suffers a dehumanizing injury as real as, and often of far more severe and lasting harm than, a blow to the jaw" (internal quotation marks omitted)); *State* v. *Liebenguth*, 336 Conn. 685, 703–704, 250 A.3d 1 (2020) ("[I]t is beyond question that the use of the [N] word . . . is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. . . . [I]t is probably the single most offensive word in the English language." (Citations omitted; internal quotation marks omitted.)); see also V. Goode & C. Johnson, "Emotional Harm in Housing Discrimination Cases: A New Look at a Lingering Problem," 30 Fordham Urban L.J. 1143, 1148 (2003) ("Emotional harm claims in housing discrimination cases tend to subtly reflect the shadow of racism in this country. It is the persistence of segregated housing patterns that contributes to a lack of understanding of the impact of racism and a diminished sense of empathy that is so essential in compensating the full nature of the dignitary harm that flows from housing discrimination." (Footnote omitted.)).

Commission on Human Rights & Opportunities *v.* Cantillon

sentatives of the conscience of the community. See *Carter* v. *Jury Commission of Greene County*, 396 U.S. 320, 330, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970) ("the very idea of a jury . . . [is of] a body truly representative of the community" (internal quotation marks omitted)); *United States* v. *Gilliam*, 994 F.2d 97, 101 (2d Cir.) (jurors are "representatives of the people"), cert. denied, 510 U.S. 927, 114 S. Ct. 335, 126 L. Ed. 2d 280 (1993); *United States ex rel. McCann* v. *Adams*, 126 F.2d 774, 776 (2d Cir. 1942) (jury "introduces a slack into the enforcement of law, tempering its rigor by the molli-fying influence of current ethical conventions"), rev'd on other grounds, 317 U.S. 269, 63 S. Ct. 236, 87 L. Ed. 268 (1942); *McKirdy* v. *Cascio*, 142 Conn. 80, 84, 111 A.2d 555 (1955) (amount of award in wrongful death actions was within province of jury given inherently speculative nature of harm). Our juries' assessment of the harm caused by racial discrimination strikes me as one such situation, and such awards should not be excluded from a CHRO referee's valuation unless the law requires other-wise.

Jury awards are not the only relevant data that was categorically excluded from consideration by the CHRO referee. Other administrative agencies, such as HUD, are also charged with the responsibility of awarding dam-ages for emotional distress caused by unlawful racial discrimination. See, e.g., 42 U.S.C. § 3612 (g) (3) (2018) ("[i]f the administrative law judge finds that a respon-dent has engaged or is about to engage in a discrimina-tory housing practice, such administrative law judge shall promptly issue an order for such relief as may be appropriate, which may include actual damages suf-fered by the aggrieved person and injunctive or other equitable relief"); 24 C.F.R. § 180.670 (b) (3) (i) (2022) ("If the [administrative law judge] finds that a respon-dent has engaged, or is about to engage, in a discrimina-tory housing practice, the [administrative law judge]

shall issue an initial decision against the respondent and order such relief as may be appropriate. Relief may include, but is not limited to . . . [o]rdering the respondent to pay damages to the aggrieved person (*including damages caused by humiliation and embarrassment*).'' (Emphasis added.)). These awards likewise provide valuable data points for CHRO referees to consider. Looking at this data would be especially useful in cases like the present one, in which a victim of discrimination has alleged harm under the federal Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., and our state equivalent, § 46a-64c. In fact, we consistently have recognized that the § 46a-64c is intended to be applied in a manner consistent with its federal equivalent, with any deviation typically providing only greater protections to citizens of this state than under the federal counterpart. See, e.g., *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, 273 Conn. 373, 385, 870 A.2d 457 (2005) (§ 46a-64c was adopted with ''the intent of creating a state antidiscrimination housing statute [that is] consistent with its federal counterpart''); id., 386 n.11 (''[our courts] have interpreted our statutes even more broadly than their federal counterparts, to provide *greater* protections to our citizens, especially in the area of civil rights'' (emphasis in original)); see also *Commission on Human Rights & Opportunities* v. *Housing Authority*, 117 Conn. App. 30, 46, 978 A.2d 136 (2009) (''[o]ne of the purposes of [Connecticut's fair housing] scheme is to render it substantially equivalent to the federal scheme, in terms of protecting the policy against housing discrimination and the rights of persons subject to such discrimination''), appeal dismissed, 302 Conn. 158, 24 A.3d 596 (2011). Given the intent and purpose animating § 46a-64c, I see no reason for the CHRO to ignore these federal administrative agency awards.

Lest I be misunderstood, I do not intend to suggest that the ultimate focus of the valuation analysis should

Commission on Human Rights & Opportunities *v.* Cantillon

shift away from the particular facts of each individual case. CHRO referees "must rely primarily on [case specific] facts relating to the severity of the discriminatory behavior and [the] duration of the resulting emotional damage." *Broome* v. *Biondi*, 17 F. Supp. 2d 211, 225 (S.D.N.Y. 1997). A victim's individual experience is paramount, and awards made in other cases are merely instructive, not dispositive or presumptive. But CHRO referees who utilize a comparative valuation methodology are not properly discharging their statutory responsibilities by adopting a comparative methodology that, by design, excludes a large universe of damages awarded by courts, juries, and other administrative agencies in racial discrimination cases.[15] Expanding the universe of comparators that referees utilize can help to ensure that the damages award in each individual case is fair. The more data, the better. See *Zakre* v. *Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 568 (S.D.N.Y. 2008) ("[r]eference to other awards in similar cases is appropriate . . . but courts must take care not to limit their review too narrowly" (citation omitted; internal quotation marks omitted)), aff'd, 344 Fed. Appx. 628 (2d Cir. 2009); cf. *Broome* v. *Biondi*, supra, 225 (comparing emotional distress damages between employment and housing discrimination claims is not improper). Of course, if a referee finds that a case is a bad data point because of factual differences, the referee has the discretion to reject the purported comparator.

A more robust comparative award approach than the one employed by the referee in this case reveals that there is a general trend within the United States Court

---

[15] For purposes of this appeal, I need not venture an opinion on the particular number of cases, or the ratio of CHRO cases to non-CHRO cases, that should be considered by the referee to provide a sufficiently representative pool of data. I would be loathe to encourage judicial micromanagement at that level of detail. It is enough in the present case to say that the categorical exclusion of all comparators except CHRO awards (and one jury award on remand) was improper.

of Appeals for the Second Circuit to award damages greater than the "high water mark" of \$50,000, with awards often sitting closer to or well into the six figures for "garden variety"[16] emotional distress in civil rights cases. See, e.g., *Lewis* v. *American Sugar Refining, Inc.*, 325 F. Supp. 3d 321, 364 (S.D.N.Y. 2018) ("[a]wards [for] garden-variety emotional distress or mental anguish in the Second Circuit range from \$30,000 to \$125,000"); *Olsen* v. *Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (same); *Watson* v. *E.S. Sutton, Inc.*, Docket No. 02 Civ. 2739 (KMW), 2005 WL 2170659, *16 (S.D.N.Y. September 6, 2005) (same), aff'd, 225 Fed. Appx. 3 (2006); see also *Lore* v. *Syracuse*, 670 F.3d 127, 176–80 (2d Cir. 2012) (\$150,000 award for emotional distress); *Parris* v. *Pappas*, 844 F. Supp. 2d 271, 277–79 (D. Conn. 2012) (\$100,000 award in compensatory damages for FHA violation).[17]

The majority cites to *Manson* v. *Friedberg*, Docket No. 08 Civ. 3890 (RO), 2013 WL 2896971, *7 (S.D.N.Y. June 13, 2013), which posits that there is a much lower range of damages, between \$5000 and \$35,000, for garden-variety emotional distress damages. See part I of the majority opinion. The majority cites *Manson* for the proposition that the higher range in *Olsen* "is hardly

---

[16] As the majority recognizes, the "term 'garden-variety' " refers to emotional distress that is established primarily through a plaintiff's own testimony, rather than through medical or psychological evidence. Footnote 3 of the majority opinion. I agree with the majority that the term "is a bit of a misnomer" in that it appears to trivialize an individual's experience with emotional distress. Id.; see A. Merjian, "Nothing 'Garden Variety' About It: Manifest Error and Gross Devaluation in the Assessment of Emotional Distress Damages," 70 Syracuse L. Rev. 689, 693 (2020) ("There is nothing '[garden-variety]' about the experience of discrimination. Discrimination is never 'commonplace' or 'forgettable,' common synonyms for this phrase.").

[17] The \$30,000 to \$125,000 range derives primarily from cases decided in the mid-2000s. This range would be much higher today after adjusting to account for inflation. As I explain in part III of this opinion, when conducting a comparative methodological approach to assess emotional distress damages, it is vital to account for the passage of time.

Commission on Human Rights & Opportunities *v.* Cantillon

a rule.'' Id. I agree that none of these ranges should serve as a rule, but it is important to note that the range cited in *Manson* is generally viewed as outdated and that cases that award damages within that lower range are typically seen as outliers. See, e.g., *Equal Employment Opportunity Commission* v. *United Health Programs of America, Inc.*, Docket No. 14-CV-3673 (KAM) (JO), 2020 WL 1083771, *13 (E.D.N.Y. March 6, 2020) (''[t]he court will not cap [garden-variety] emotional distress damages at $35,000 on the basis of *Moore* [v. *Houlihan's Restaurant, Inc.*, Docket No. 07-CV-3129 (ENV) (RER), 2011 WL 2470023, *6 (E.D.N.Y. May 10, 2011)], an outlier among recent cases in this circuit, and which cites to *Rainone* [v. *Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005)] for its damages range [of $5000 to $35,000], a case that courts have acknowledged is quite outdated and is now considered a [lower than normal] damages range''); *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46 n.4 (rejecting defendants' reliance on *Rainone* for damages range of $5000 to $35,000 and noting that ''[m]ore recent cases find this range to be significantly higher''); see also, e.g., *Watson* v. *E.S. Sutton, Inc.*, supra, 2005 WL 2170659, *15 (range of $5000 to $30,000 was ''at the low end of the range of damages generally awarded under New York law''); A. Merjian, ''Nothing 'Garden Variety' About It: Manifest Error and Gross Devaluation in the Assessment of Emotional Distress Damages,'' 70 Syracuse L. Rev. 689, 699 (2020) ($5000 to $35,000 range was derived from outdated 1999 law review article, which omitted many Second Circuit cases in which awards were well above $35,000).

I am very concerned not only that the referee in the present case applied a presumptive range for awarding emotional distress damages in CHRO proceedings, but deliberately selected a range drawn exclusively from a small group of prior CHRO awards for the purpose of keeping CHRO awards low. This unofficial and unautho-

347 Conn. 58 JUNE, 2023 99

Commission on Human Rights & Opportunities *v.* Cantillon

rized methodology now serves as a self-replicating and self-contained precedential source for future administrative adjudications in Connecticut. Its purpose and effect are to constrain the referees to award damages lower than those authorized by law. Under current law, if CHRO referees apply a comparative value methodology, they must look beyond the narrow confines of prior CHRO awards to consider comparable awards made in like cases by other decision makers, including courts, juries, and other relevant administrative agencies. A larger and more representative pool of comparators will ensure that awards for emotional distress are fair, just, and reasonable.

III

The referee's valuation methodology also was flawed because she failed to account for inflation when she used prior awards to arrive at a damages award in the present case. As I discussed previously, the referee established a range of $6000 to $50,000 for emotional distress damages on the basis of CHRO awards made between 1998 and 2010. Of those awards, the referee found three decisions particularly instructive in valuing the complainant's harm: *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, supra, 2006 WL 4753467, *10 (awarding $25,000 for emotional distress), *Commission on Human Rights & Opportunities ex rel. Little* v. *Clark*, supra, 2000 WL 35575648, *16 (awarding $20,000 for emotional distress), and *Commission on Human Rights & Opportunities ex rel. McIntosh-Waller* v. *Vahistrom*, Docket No. 0750080, 2008 WL 2683291, *8–9 (C.H.R.O. June 6, 2008) (no damages were awarded because no liability was found).[18] The referee's valuation methodology was erroneous as a matter of law because she used these historical awards without adjusting for inflation.

[18] See footnote 1 of this opinion.

Commission on Human Rights & Opportunities *v.* Cantillon

It is crystal clear that an adjustment for inflation is necessary under these circumstances.[19] The Second Circuit has emphasized the importance of considering the passage of time and inflation when utilizing a comparative award approach to review jury damages awards for excessiveness. See, e.g., *Meacham* v. *Knolls Atomic Power Laboratory*, 381 F.3d 56, 78 (2d Cir. 2004) ("the passage of time since [those] cases were decided could reasonably support higher verdicts"), vacated on other grounds sub nom. *KAPL, Inc.* v. *Meacham*, 544 U.S. 957, 125 S. Ct. 1731, 161 L. Ed. 2d 596 (2005); *DiSorbo* v. *Hoy*, 343 F.3d 172, 185 (2d Cir. 2003) ("when considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for [the plaintiff's] injuries today is higher than what it would have been ten years ago"); *Luciano* v. *Olsten Corp.*, 912 F. Supp. 663, 673 (E.D.N.Y. 1996) ("an amount that may have been excessive five to ten years ago . . . may be reasonable today simply by virtue of inflation"), aff'd, 110 F.3d 210 (1997). A dollar in 1998 was worth considerably less than a dollar in 2017. To achieve equivalency, the referee in 2017 would need to award approximately $1.50 for every dollar awarded nineteen years earlier. See Bureau of Labor Statistics, United States Department of Labor, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 23, 2023). The referee failed to account for inflation when she relied on past awards to calculate the amount of the complainant's emotional distress damages,

---

[19] In *Moore* v. *Moore*, 173 Conn. 120, 376 A.2d 1085 (1977), this court held that our courts may take judicial notice of the "fact of inflation . . . without affording [the parties] an opportunity to be heard . . . ." Id., 123. To the extent that the rate of inflation may be subject to reasonable factual dispute; see id.; the parties are free to proffer evidence regarding the rate of inflation. In the absence of evidence, the rate of inflation, as reflected by governmental statistics, such as those provided by the United States Department of Labor, should be presumed. See Bureau of Labor Statistics, United States Department of Labor, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm (last visited June 23, 2023).

Commission on Human Rights & Opportunities *v.* Cantillon

and, therefore, her valuation methodology was fundamentally flawed.

IV

Our legislature has placed the responsibility of compensating victims of racial discrimination on the CHRO. The CHRO has a duty to ensure that victims of racial discrimination are properly compensated in accordance with the law. See, e.g., *State* v. *Commission on Human Rights & Opportunities*, supra, 211 Conn. 478. In order to fulfill this duty using a comparative valuation methodology, CHRO referees may not limit their analysis of comparative data to prior CHRO cases only. Nor may they fail to adjust past awards to account for the rate of inflation. Because the referee in the present case used a flawed valuation methodology to calculate the complainant's award of damages, the Appellate Court's judgment must be reversed. Accordingly, I respectfully dissent.